# CHARLESTOWN.

TAYLOR *v.* BALTIMORE & O. R. Co.

Submitted June 13, 1889.—Decided September 13, 1889.

1. RAILROAD COMPANIES—BRIDGES—DAMAGES.
    Though a railroad company has under its charter the right to bridge a stream, it must do so in a proper, skillful manner, leav-

ing ample way for the passage of the water, so as to save riparian owners from overflow ; and if it fail so to construct its bridge, and by reason of its bridge-structure narrowing the natural channel backwater is caused, overflowing the premises of a riparian owner and causing him damage, the campany is liable·

2. RAILROAD COMPANIES—DAMAGES.

Where a person or corporation is vested with authority by the legislature to do an act, it will be protected from all responsibility, and liable to no suit at law or equity, provided what it is authorized to do is done carefully and skillfully, though without such authority it would have been a nuisance, but, if done carelessly and unskillfully, and damages result from such carelessness and want of skill, it will be responsible.

3. EVIDENCE—REVERSAL OF JUDGMENT.

Where illegal evidence is admitted, against the objection of a party, it will be presumed that it prejudiced such party, and if it may have prejudiced him, though it be doubtful whether it did or not, it will be cause for reversal of the judgment ; but if it clearly appear that it could not have changed the result,—that, if it had been excluded, the same result would have followed,— it will not be cause for reversing the judgment.

4. EVIDENCE— DEMURRER TO EVIDENCE—REVERSAL OF JUDGMENT.

If in such case there is a demurrer to evidence, and an alternative verdict, and, after disregarding upon such demurrer such illegal evidence, and treating the balance of the evidence as is proper under the rules applicable to demurrers to evidence, there is plainly enough evidence to sustain a judgment for the demurree, the admission of such illegal evidence will not reverse the judgment; otherwise it will.

5. EVIDENCE.

Opinions merely of a witness are not generally admissable evidence. Point 2 of syllabus in *Hall* v. *Lyons*, 29 W. Va. 410 (1 S. E. Rep. 582,) approved.

*J. A. Hutchinson* for plaintiff in error.

*O. Johnson* for defendant in error.

BRANNON, JUDGE:

In August, 1886, James Taylor brought an action of trespass on the case in the Circuit Court of Ritchie county against the Baltimore & Ohio Railroad Company, to recover damages caused by the overflow of his premises during a freshet in Hughes river, which overflow was caused by a bridge over

said river on the Parkersburg branch of the Baltimore & Ohio Railroad, as he alleged. The defendant demurred to the declaration, and its demurrer was overruled. It demurred to plaintiff's evidence, and the demurrer was overruled. It moved the court to exclude the plaintiff's evidence, and its motion was overruled. A verdict was rendered by a jury in favor of plaintiff for $400.00 damages, subject to the opinion of the court on the demurrer to the evidence. The court overruled a motion for a new trial, and rendered judgment for plaintiff for said damages and the costs. The company obtained a writ of error and *supersedeas.*

Counsel for appellant raises a preliminary question by his contention that, as no demurrer to the evidence is found in the record, this Court must at once reverse the judgment, set aside the verdict, and remand for a new trial, and go no further. The record states that, "the plaintiff and defendant having closed their evidence, the defendant tendered its demurrer to the evidence of the plaintiff, and the plaintiff joined in said demurrer, which is signed and made part of the record, and thereupon the jury was directed to find their verdict in the alternative, subject to said demurrer." A verdict subject to such demurrer was returned. On another day the record states that, "the court, having considered the demurrer to the evidence, taken by the defendant and joined in by the plaintiff, and having maturely considered the matters of law arising on the said demurrer to the evidence, is of opinion that the said evidence is sufficient in law for the plaintiff to have and maintain his action," and proceeded to render judgment. This same order shows that the defendant excepted to certain opinions of the court, and tendered two bills of exceptions, Nos. 1 and 2, which were made part of the record. No. 1 is for admission of evidence, to which defendant objected; No. 2 sets out in full the evidence of the plaintiff's witnesses as given, and shows that the defendant moved the court to exclude it from the jury, that the court refused to exclude it, and that to such ruling the defendant excepted. This exception certifies that the evidence in it contained was all the evidence given by the plaintiff in chief. It gives the evidence on direct and cross-examination. No formal demurrer to the evidence appears

in the record, and the clerk certifies that the demurrer to the evidence "is not now on file in the papers of this cause."

It is not necessary in this case to say what should be the action of this Court where a case is decided only upon a demurrer to the evidence, and that demurrer is lost, and not produced in the appellate court, as it may be decided on other grounds. The record distinctly states that there was a demurrer to plaintiff's evidence, and that it was passed on by the court. If it were before us, what more would it show? It would recite the plaintiff's evidence. That evidence is found in full in bill of exceptions No. 2, and this want is supplied; so that all the purposes which such formal demurrer could answer are answered by the said orders and that bill of exceptions. We are authorized to look into that bill of exceptions for this purpose, as it states that it contains all the evidence given by the plaintiff. Though one bill of exceptions can not be inspected to aid another, unless that other refers to it, yet, where a bill sets out all the evidence, it may be looked to in considering a question raised in another exception. *Hall* v. *Hall*, 12. W. Va. 2.

The record pointedly says that the defendant demurred to plaintiff's evidence; and that evidence is here in the record, and the court certifies it to be all the plaintiff's evidence. In *Lee* v. *Bridge Co.*, 18 W. Va. 299, the demurrer had only the plaintiff's evidence, and the court held that "upon a demurrer to evidence, where the evidence is wholly that introduced by the plaintiff, the demurrant admits not only the truth of the facts proved, but also all that may be fairly inferred from those facts." Under these circumstances, there can be no good and solid reason for overturning the judgment on this ground. The demurrant can have the benefit of his demurrer in the mode he took. And if no error affirmatively appear there can be no reversal, even if the demurrer, if here, should present a different appearance, and show error; for error must affirmatively appear. 4 Minor, Inst. 870, 871. *Shrewsbury* v. *Miller*, 10 W. Va. 115.

No defect in the declaration is pointed out, and I discover none, and therefore there is no error in overruling the demurrer to the declaration.

Did the court err in overruling the demurrer to evidence

and the motion to exclude the evidence? Upon such motion to exclude and demurrer certain well-settled principles apply. In the language of the opinion of this Court prepared by Judge GREEN in *Franklin* v. *Geho,* 30 W. Va. 34 (3 S. E. Rep. 168). "As a demurrer to evidence, or a motion to exclude from the jury the plaintiff's evidence, withdraws from the jury—the proper triers of facts—the consideration of the evidence by which they are to be ascertained, the party whose evidence is thus withdrawn from its proper forum is entitled to have it most benignly interpreted by the substituted court. See *Schwarzbach* v. *Union,* 25 W. Va. 642; *Miller* v. *Insurance Co.,* 8 W. Va. 515. In such cases the law is, as stated by Judge STANARD, in *Ware* v. *Stephenson,* 10 Leigh. 164 : ' In determining the facts inferable from the evidence, inferences most favorable to the demurree will be made in cases in which there is grave doubt which of two or more inferences shall be deduced.' And, again, he says: 'When the question is whether or not a fact ought to be taken as established by the evidence either directly or inferentially in favor of the demurree, I do not know a juster test than would be furnished by the inquiry : Would the court set aside the verdict had the jury on the evidence found the fact ? If the verdict so finding the fact would not be set aside, it ought to be considered as established by the evidence demurred to.' "

This doctrine is laid down also in *Fowler* v. *Railroad Co.,* 18 W. Va. 579, and *Heard* v. *Railroad Co.,* 26 W. Va. 455. And in the latter case it is held that the rule for determining what facts shall be considered as established in cases of demurrer to evidence, when all of it is adduced by the demurree, is that the court shall regard the demurrant as necessarily admitting by his demurrer not only the credit and truth of all the evidence, but all inferences of fact that may be fairly deduced from it, and that most favorably to demurree ; and, unless there is a decided preponderance of probability or reason against the inference that might be made in favor of the demurree, such inference ought to be made in his favor. 2 Tuck. Bl. Comm. 297.

The evidence of the plaintiff is voluminous. It tends to show that on the 13th of May, 1886, the plaintiff owned a

tract of land on North fork of Hughes river, on which were a water grist and saw mill and dwelling house, and that a freshet overflowed his land, inundated his mills and dwelling-house and well of water, sanded his meadow, and destroyed his garden, and inflicted severe injury upon him; that about a mile below his dwelling and mills, near his lower line, was a railroad bridge over said river, called the "Lavelle Bridge" on the North-Western Virginia Railroad, commonly called the "Parkersburg Branch of the Baltimore & Ohio Railroad," then in the possession and under the control of the defendant company. This bridge was built in 1858. In September, 1885, this company built additions to the abutments, to make a change in the line of the bridge, which additions narrowed the water-way or openings six feet from what it had been up to that date,—from top of the abutments to the surface of the water, in ordinary stage, twenty six feet four inches. Prior to these additions, there had been deposited in the stream at the base of each abutment broken rock and clay, taken out of a tunnel near by, which sloped off from the abutment towards the center of the channel. Part of this was removed, to make way for the additions to the abutments; but part remained and occupied a considerable space in the channel, at the bases of the abutments, according to several witnesses. One witness measured perpendicularly from the tops of the abutments down to this rubbish, and made it at one corner of one abutment eighteen feet, at the other twenty three and a half feet; and at one corner of the other abutment twenty and one sixth feet; at the other, seventeen and one sixth feet, whereas he made the distance from the bridge, even with the top of the abutments, to the water in the center of the channel, between the abutment, twenty seven feet. The distance between the abutments is ninety two and a half feet. Embankments, constituting the track approach to the bridge, extend clear up to the abutments, so that the only passage for the water is between the abutments.

One witness (McCullum) measured the river's natural channel from the top of the banks just above and just at the bridge at 137½ feet, and states that the difference in the width of the channel between the abutments and the natural chan-

nel above would be the difference between ninety two and one half and 137½ feet. (Likely, in view of other evidence of measurement, and as he gives it as 157½ in another part of his evidence, this is a clerical or typographical error in the 137½, and it should be 157½ feet.) This witness also says this rubbish, considerable in amount, narrows the channel, and that at low water it is only twenty five feet, but much wider above the bridge.

Another witness, E. J. Taylor, made measurement of the natural channel from top of bank, to top of bank, making it 163 feet, square across at the bridge; and following the line of the bridge, which is oblique, 186 feet; and square across, at a point seventy five yards above the bridge, 160 feet. The river is of about uniform width in the vicinity. A bridge over the same river on the same railroad, called the "Straight-Line Bridge," a quarter of a mile below the Lavelle bridge, which is the bridge in question, has a span between the abutments of 110 feet, is twenty six feet nine inches high. The rise of water in this freshet at Taylor's mill was twenty four and a half feet; half-way between it and the Lavelle bridge, twenty five and a half feet; between its abutments twenty five feet, or within eighteen inches of the bridge cord; whereas it wanted seven feet of reaching the bridge cord of the bridge a quarter of a mile below, showing a rise there of about nineteen feet; and the rise at Cairo, one and a half miles below, was nineteen feet. For two and a half miles below plaintiff's mills, and a distance not given above, the water in this freshet was not out of the banks except at one or two very low places, and disturbed nothing except on plaintiff's farm.

All the witnesses who are acquainted with the stream and the bridge declare that the rock and clay piled around the bases of the abutments obstruct the channel, and that the additions to the abutments also obstruct the water, and both make the re-flow much greater than before the additions; and the plaintiff says the additions cause an increased height of water at his mill-dam of five feet. He attributes his damage to this addition and rubbish. He states that before the addition it took a pretty large rise to stop grinding at his mill,—a rise of two or three feet; afterwards a rise of one

foot would stop it.    There was a freshet in 1875, higher than this freshet; rising in plaintiff's house seven inches.    The timber lodged against this bridge, and there was a drift a quarter of a mile above it, choking the entire river, and carrying away the bridge.    There was another in 1876, higher.    There was one between 1876 and 1886, which was one and a half inches high in plaintiff's house.    Plaintiff, in his evidence, says that but for the bridge he would receive no damages from freshets, and that the additions to the abutments greatly increase the re-flow on the premises.

Under the evidence, especially when weighed by the principles by which evidence is to be weighed under a demurrer to evidence, it must be held that this bridge, if it did not wholly cause, materially increased, the re-flow upon the plaintiff's property.    The bridge, as it was before the additions to the abutments, was probably inadequate for the stream, being twelve feet narrower than the one just below. After continuing it of that width for twenty seven years, the company, by such additions, materially narrowed it to the extent of six feet in width by twenty six and a half in height, and, in addition, left rubbish of rock and clay around the base of each abutment considerable in amount, thus further materially and unnecessarily narrowing the water-way, and thus either wholly caused or aggravated the plaintiff's damage.

A railroad company, though it has a charter to build its road, and the incidental right to bridge streams, must so use its powers as not to injure others.    It falls under the legal maxim, *sic utere tuo ut non alienum lœdas.*    It is engaged in a lawful and beneficial work, it is true; but if in that work it hurt another by unskillful, improper construction, that other has, without fault on his part, sustained damage for which he must be compensated by the party from whose act that damage comes, though that act be done under lawful authority. The company must construct bridges adequate to allow the passage of water of streams in stages which may reasonably be expected in the section where the bridges are situated. The grant of the franchise by the state is not to be construed to allow it to be so used as to inflict damage on the citizen which by any reasonable precaution can be avoided.    Why

should a corporation, though armed with a charter, any more than an individual, engaged in a work for its gain be allowed to inflict damage without compensation?

The question is, did the damage arise by reason of the bridge? Does the bridge narrow the passage by an invasion of the natural channel, thus lessening its capacity to pass the water below what would be its capacity in its natural channel? Would the damage have occurred had not the bridge been present? If these questions are answered in the affirmative, the company is liable, unless it be a pure *actus Dei.*

A railroad company building and maintaining as part of their road a bridge across a river in such manner as to ob-struct the passage of the water are liable to an action of tort by the owner of the land thereby overflowed, unless they show they have taken reasonable precautions to prevent unnecessary damage to the land. Per BENNETT, J., *Norris* v. *Railroad Co.*, 28 Vt. 102. In *March* v. *Railroad Co.*, 19 N. H. 372, it was held that "a railroad corporation has no right to interrupt or divert the natural flow and course of the water of a stream, to cut it off from those below, or to flow it back upon those above their road. They must provide by culverts, bridges, and other means that the water may flow uninterruptedly in its accustomed channels; and if they neglect so to do they are liable to the party injured in an action for damages. * * * If, however, it should be found impracticable in any particular case to construct a railroad without obstructing the natural course of a stream of water, private interest must then yield to public necessity, but compensation must be made to the sufferer. A railroad corporation have no more right to cover one's land with water without compensation than they have to cover it with the earth and rocks and rails of their track."

A railroad corporation in New York, though authorized by the legislature to cross a stream, if done in such manner as not to impair its usefulness, is liable for damage to land not on the stream by an overflow of its waters caused by the construction over the stream and through its banks, whether the stream be a public highway or a private water course. The corporation, not being owners, required legislative authority to cross. They were bound, in crossing the

stream, by the same obligation which would have bound a private owner of the land and stream had he bridged it. *Brown* v. *Railroad Co.*, 12 N. Y. 486. It appeared in that case that the damage was done to the plaintiff by flooding his land in a freshet, caused by defendant's bridge, against which flood-wood stopped, and the waters of the stream were thereby set back on plaintiff's land. The bridge had been built by another corporation, whose road had afterwards become the property of defendant.

In *Lawrence* v. *Railroad Co.*, 16 Q. B. 643, damage was caused by constructing the road without leaving sufficient openings for passage of flood-waters, whereby the water was forced on plaintiff's land. It was held that, though the road was built where the act pointed out it should be, and the act did not require the defendant to make the openings, yet, as by proper caution they might have avoided the injury, they were liable. See Ang. Water-Courses, §§ 465*c*, 465*d*, and 465*e*.

A town, in building a highway across a natural stream, should provide for and maintain a free passage of the water, so that it may not be obstructed and pent up in such a manner as to flow back on land belonging to the riparian proprietor. *Haynes* v. *Burlington*, 38 Vt. 350. In this case, Poland, C. J., said:

"In the case of an individual owner of a strip of land of suitable width for a highway, who should build a road upon it, he would by ordinary legal principles be bound to do it in a prudent and reasonable manner, and so as to avoid doing any unnecessary damage to persons owning lands adjoining. And so, if such person had occasion to build his road over a natural stream or water-course, the law would require him to provide some suitable and sufficient means for the passage of the water, so that the adjoining proprietors should not suffer damage by its being obstructed. Substantially the same obligations to the owners of lands adjacent to the highway, we consider, are devolved upon towns in the building and maintaining their roads."

In Massachusetts it is well settled that in all cases where a highway, turnpike, bridge, or other way is laid across a natural stream, it is the duty of those who use the franchise

or privilege to open bridges or other means for free passage of water, so that it shall not flow back on lands, and to keep it so as not to obstruct the stream. *Rowe* v. *Bridge Corp.*, 21 Pick. 344; Ang. Water-Courses, § 331*b*; 2 Hil. Torts, c. 36, § 18.

The owner of a dam, though erected on his own land, is answerable to a neighbor for injury to his land in times of ordinary freshet, occasioned or enhanced by the dam. In erecting his dam he is bound to regard his neighbor's rights and security; not only in ordinary stages of water, but in those stages occasioned by ordinarily recurring freshets. If by his dam he aggravates the injury of an ordinary freshet, he will be responsible. He ought to provide against this in erecting his dam. If he can not, then it is a case in which he must procure a license from his neighbor to suit the exigency, or not erect it at all. *Casebeer* v. *Mowry*, 55 Pa. St. 419, 423.

In the case in hand the abutments and fills approaching them invaded the natural channel, and contracted it, at least sixty five and a half feet, as it left a passage of only ninety two feet, whereas the natural channel was $157\frac{1}{2}$. The water was much higher above than just at the lower side of the bridge, and the pitch or descent of the water between the abutments was very observable, and the current great. The height of the water at this bridge was twenty five feet, while a quarter of a mile below at the other bridge, and at Cairo, one and a half miles below, it was nineteen feet, though several considerable streams came in below this bridge, and the natural features of the channel and banks in the intervening section were about uniform. No harm was done by the stream, except for a mile or so above the bridge. The conclusion is strong and decided that the plaintiff's damage sprung from the bridge; in fact, we may say, from the additions to its abutments, and the deposit of broken rock and clay at their bases.

It is argued that, as the company was authorized by the legislature to build its road, it is not liable. In England, parliament is omnipotent, and may give the right to take private property for public use without compensation, but our constitutions prohibit the taking it, for even public use, without compensation. *Varner* v. *Martin*, 21 W. Va. 534;

Cooley, Const. Lim. 530.   Under the constitution of 1872 private property can neither be taken nor damaged for public use without compensation.   Though the charter under which this railroad was built was enacted long before this constitution, when the constitution prohibited only the taking, not the damaging, of property without compensation, yet it was in force when these additions were made to the bridge abutments, which additions damaged the plaintiff's property; and therefore it may be said the company would be liable under the constitution of 1872, even if it would not have been before it.   But I do not deem it necessary to so decide, for the company is guilty of negligence in invading materially the natural channel of the stream, and maintaining a bridge of inadequate water-way, when it was within its power to provide one amply adequate to allow a safe passage of the water.

In *Spencer* v. *Railroad Co.*, 23 W. Va. 427, in the opinion the law is stated with enough liberality towards those exercising an authority conferred by law, and inflicting hurt upon others, as follows:   "Now, it is well settled, and universally admitted, that where a person or corporation is vested with authority by the legislature to do an act in regard to which they will be perfectly protected from all responsibility, and will be liable to no suit, either at law or in equity, provided that what they are authorized to do is done carefully and skillfully, though without such authority it would have been a nuisance, but, if done carelessly and unskillfully, and damages result from such carelessness and want of skill, they will be responsible."

This rule holds them responsible for want of skill, carelessness, negligence.   When the legislature grants a charter or privilege to perform a work, it is always with the understanding that it is to be exercised in such manner, where possible, as not to injure others.   An action will not lie for injury "from the execution of powers given by act of parliament; those powers being exercised with judgment and caution.   But if the statutory powers are exceeded, or are not strictly pursued, or are carelessly and negligently done, an action is maintainable." 2 Add. Torts. § 1. c. 16.

It is argued that the damage came from an extraordinary

freshet, and defendant is not liable, because that was the act of God. In *McGraw* v. *Railroad Co.*, 18 W. Va. 364, will be found this definition of the act of God : "Such an accident as could not happen by the intervention of man,—as, storms, lightning, and tempest ; those losses that are occasioned by the violence of nature, by that kind of force of the elements which human ability could not have foreseen or prevented,—such as lightning, tornadoes, sudden squalls of wind, and extraordinary convulsion of nature ; a direct visitation of the elements, against which the aids of science and skill are of no avail ; physical causes which are irresistible, which human foresight and prudence can not anticipate, nor. human skill and diligence prevent,—such as loss by lightning, storms, innundations, and earthquakes, and the unknown dangers to navigation which are suddenly produced by their violence,—are the acts of God, or inevitable accidents."

But this case does not come up to the standard of that definition. Such freshets as this had often occurred, and were necessarily to be anticipated, and came in the usual order and course of nature in that section ; and engineering and mechanical skill were at hand and adequate to meet such a freshet, and that, too, with a reasonable expenditure. It was simply a high rise, not an extraordinary one.

In Wood, Nuis. § 347, treating of dams, it is said : "The water may be raised by a dam, so as to keep it up to his neighbor's line, but he is bound at his peril not to raise it above the line, so as to flow his land ; and he will be answerable for all injuries that result from such causes as are usual and ordinarily incident to the locality by rises in the stream which might be reasonably anticipated during any season of the year. If the stream is in a section of country where at certain seasons of the year at regular intervals large bodies of rain fall, so as to swell the stream to unusual proportions, or where large bodies of snow fall, which, in melting, finds its way into the stream, and creates a freshet or flood, a much higher degree of care is required than in a section where these occurrences are the exception, rather than the rule. In the one case, he who pens up the stream by a dam is bound at his peril to guard against damage to others

therefrom, either from storm or flood; while in the other only reasonable care is required, and no liability attaches because the damage is the result of unusual, extraordinary, and unforseen causes."

For these reasons the demurrer to the evidence and the motion to exclude it were properly overruled. And for the same reasons the motion to set aside the verdict as contrary to the evidence was properly overruled. The defendant has no evidence in the record. There appears in the printed record evidence of the defendant, but it is not incorporated in the bill of exceptions containing the evidence. The evidence of plaintiff being all the evidence, as it is sufficient to sustain his case on demurrer to evidence, so it is on a motion to set aside the verdict because of insufficiency of evidence. Where, as here, only the evidence, not the facts, is certified, the court must, on a motion for a new trial, because the verdict is contrary to the evidence, make all inferences reasonable in favor of the verdict, as on a demurrer to evidence, and can not set it aside unless it be plainly contrary to the evidence. *Sheff* v. *Huntington,* 16 W. Va. 308; *Black* v. *Thomas,* 21 W. Va. 709; *State* v. *Flanagan,* 26 W. Va. 117; *Franklin* v. *Geho,* 30 W. Va. 27 (3 S. E. Rep. 168). The rule applies with stronger force when a motion for a new trial is urged in an appellate court. *Black* v. *Thomas,* 21 W. Va. 709; *Miller* v. *Insurance Co.,* W. Va. 116.

Bill of exceptions No 1 is to the admission of evidence objected to. It contains isolated items of evidence taken from the evidence contained as a whole in bill No. 2, and should be read in connection with it.

E. J. Taylor was asked the distance from Cornwallis bridge (the bridge in question) to the straight-line bridge, and answered: "Just a short distance. It is not, perhaps, on the track, over a quarter of a mile." He was asked the distance between the piers of straight-line bridge, and answered, "110 feet;" and gave its height, twenty six feet nine inches. I see no objection to this question and answer. The plaintiff had a right to show that the abutments of Cornwallis bridge did damage to him, and could introduce any evidence tending to show this. The fact that the bridge on the stream so close as a quarter of a mile, having a wider water-way,

with a depth of water under it less than under the Cornwallis bridge, (Lavelle bridge,) which had a narrower water-way, tended to show that it was the inadequate water-way under the latter bridge which caused the injury, and caused the water to back up five feet more than if it had been of the same width, and it was rather an admission that a greater width than ninety two and a half feet was necessary and prudent in that the company had a bridge of a much wider span just below.

Witness W. C. Gilbert was asked: "Did you see anything about his garden? Did he have a garden there?" and answered "Yes." He was asked: "How were the fences around the garden? In what condition were they left, do you know?" and answered: "My recollection is there was a panel or two left somewhere about the garden, but do not recollect where it was." As this evidence bore upon the character and extent of plaintiff's loss, it is plainly admissible. He was asked: "Do you know what the rise of the water was below the bridge in a freshet of 1886,—the perpendicular?" and answered: "I can not give it to you exactly. I was at the bridge at the time of this water in controversy, and my memory is it lacked about eighteen inches of coming up to the cords of the bridge. I did not measure it. I saw some other party measuring it, but it has slipped my memory." He was asked, "What was the rise at the lower bridge?" and answered: "I did not go down to the lower bridge at that time. I went to Cornwallis. But in a day or two afterwards I went to straight-line bridge,—the lower bridge." He was asked: "What was the rise of the water at that bridge below the Lavelle bridge?" and answered, "I did not measure the rise. The observation at that bridge was from the mark of the high water, the same as it was on the other bridge. My recollection is it was in the neighborhood of seven feet to reach the other bridge." I think this evidence was proper to go to the jury.

E. J. Taylor's evidence. Having stated that he owned a farm near Cornwallis, he was asked this question: "State, as to your opinion, observation, or otherwise, if those piers had been in the condition they were before the addition was made to them, and before the loose rock was tumbled in around

the bottoms of the abutments, would the freshet that occurred at that time have overflowed your land to have done the damage that it did, or have done any damage?" He answered: "No; I do not think it would." This is opinion evidence. Opinion evidence is, under the general rule, not admissible. 1 Greenl. Ev. § 440 ; 4 Minor, Inst. 701. This question touching evidence of opinion of witnesses is of daily occurrence in trials, and of great practical difficulty. *James v. Adams*, 16 W. Va. 261. "The fact that any person is of opinion that a fact in issue, or relevant, or deemed to be relevant, to the issue, does or does not exist, is deemed to be irrelevant to the existence of such fact." 7 Amer. & Eng. Cyclop. Law, 79. Such is the general rule, though there are exceptions to it arising from necessity. The difficulty arises in defining what is opinion evidence, in its practical application.

1 Bish. Crim. Proc. § 1177 : "Opinion of witnesses. We have seen that what a witness describes as personally observed is, in philosophical truth, merely his inference from sensations felt, and that there is no evidence which is not to this extent presumptive. In other words, all testimony is to opinions. But the witness alone is competent to form an opinion as to the causes of his sensations of this class. As to them he is an expert, and the only expert in existence. So, when he speaks to his opinions in this class of facts, he and his hearers alike term his opinions facts. But an opinion which the jurors are in a situation to draw as well as he will be drawn by them ; and, though he should also have formed his opinion, he will not be permitted to state what it is. Sec. 1178. Opinions on imperfectly explainable facts. There are classes of facts which, while they may be observed with sufficient accuracy and fullness to constitute a just foundation for an opinion, can be only imperfectly narrated. In reason, the inference which a witness draws from a series of observed facts of this sort must be helpful to a jury required to embody in a verdict their opinion upon them. The adjudications on questions of this class are to a considerable extent conflicting ; many of them are obscure, and various points are unsettled; but, on the whole, the doctrine of reason is that also of the books, the result being that in these cases the

witness is to relate the facts as fully and exactly as he can, and add his conclusion from all he saw and heard, as the only practicable method of supplying the necessary imperfections of the narration."

In Whart. Crim. Ev. § 457, it is stated; "That a witness' opinion is admissible is a settled rule, though much difficulty exists as to the meaning of the term. What is opinion? 'Did A. shoot B?' C., a by-stander, answers: 'My opinion is that he did. I saw the pistol aimed. I heard the report. I saw the flash. I saw B. fall down, as I supposed, dead. From all this I infer that A. shot B.' This is all inference on the part of the witness, yet it is admissible."

In section 458, Wharton says: "The true line of distinction is this: An inference necessarily involving certain facts may be stated without the facts, the inference being an equivalent to a specification of the facts; but when the facts are not necessarily involved in the inference, (*e. g.*, when the inference may be sustained upon any one of several distinct phases of fact, none of which it necessarily involves,) then the facts must be stated. In other words, when the opinion is the mere short-hand rendering of the facts, then the opinion can be given, subject to cross-examination as to the facts on which it is based."

In section 459, Wharton says that, as to matters concerning which the jury can themselves form opinions, witnesses can not state opinions which do not themselves involve the facts from which they are drawn.

The question propounded to Taylor called for his opinion or conclusion, based on facts or circumstances to him known, about a material matter in issue, viz., whether the additions to the abutments did him damage; and upon that matter the jury could draw an opinion just as well as Taylor, as it was not of such nature that they could not form an opinion on it. It may be said he had peculiar knowledge of the bridge and the stream at the bridge and on his premises as before and as after those additions, and should therefore give his opinion; but the fact remains that he is asked for what is and can be only his opinion, and that drawn from facts capable in their nature of being presented to the jury, and on which they could readily pass. The jury must base their verdict

on their own weighing of evidence, not on the weight which a witness may give it.

This evidence being improper, what is its effect on the case ? On its consideration of the demurrer to the evidence, the motion to exclude it, and the motion for a new trial, the court should repair the error in admitting it by entirely excluding it; and if without it the plaintiff's case could not be sustained, should have decided for the defendant, rendering judgment on the demurrer to the evidence for the defendant, or excluding the evidence which would have resulted in a verdict for it, and on the motion for a new trial rendering judgment for defendant; but if, after excluding such evidence, there was enough to sustain the plaintiff's case, it should have. given him judgment. I think the Circuit Court, viewing the balance of the evidence upon a demurrer to the evidence, could well find enough evidence to sustain the plaintiff's case, outside of this objectionable evidence. The jury, except as to amount of damages, did not pass on the evidence, for on the issue it found for the plaintiff or the defendant, according as the opinion of the court might be for the one or the other on the demurrer to the evidence.

The defendant, having staked the result on such demurrer, withdrew all trial of the facts on the issue from the jury. Hence the motion to set aside the verdict had no other effect than to save from waiver, if needed for that purpose, the benefit of exceptions to the action ·of the court on the admission of evidence and said demurrer, for the court in deciding it must apply the same principles as on the demurrer to evidence. There was a verdict, but it was dependent upon the action of the court on that demurrer. There was no verdict independent of such demurrer, which the defendant could ask to be set aside, for, if the court should decide for it on the demurrer to evidence, that verdict was in its favor. Hence the same principles apply on the motion to set aside the verdict as on the demurrer to evidence; that is, as, excluding this improper evidence, there was enough to sustain the plaintiff's cause, it did not err in overruling the motion to set aside the verdict, if in fact it had any action to take on it.

Even where the issue has been tried by a jury on the evidence, and an absolute verdict for one side has been found, on a motion to set aside on the ground that improper evidence has been admitted the admission of such evidence does not always call for a reversal; for in *Hall* v. *Lyons*, 29 W. Va. 410, (1. S. E. Rep. 582) it is held in such case the appellate court will presume that the defendant was prejudiced by such evidence, unless it affirmatively appear that in point of fact he could not have been prejudiced by it; and ordinarily this can only be made to appear by all the evidence being certified, so that the appellate court is satisfied that, if this improper evidence had been excluded, the plaintiff's case would still have been made out so clearly that, if the jury had found a verdict for the defendant, the court ought to have set it aside as unsustained by the evidence, or contrary thereto. In his delivery of the opinion in that case, Green, J., says. "It would be folly to set aside a verdict when this court is of opinion that the jury should and would render the same verdict on another trial, the improper evidence having been excluded from their consideration. It is not necessarily good ground to reverse a judgment that the record shows that the court below admitted improper evidence against the plaintiff in error."

Had an absolute verdict been found for the defendant, and had such improper evidence been excluded, the Circuit Court should have set it aside.

In Payne's Case, 31 Gratt. 855, the rule is thus laid down: "If the only objection to the evidence was its irrelevancy, and it could not possibly have prejudiced the prisoner, then the judgment ought not to be reversed for the error in not excluding it; for to authorize the reversal of a judgment for admitting irrelevant evidence, not only must the evidence be irrelevant, but it must be of such a nature as that its admission may have prejudiced the prisoner. If he may have been so prejudiced, even though it be doubtful whether in fact he was so or not, that is sufficient ground for reversing the judgment. See *Insurance Co.* v. *Trear*, 29 Gratt. 255."

This rule is approved by this Court in *State* v. *Kinney*, 26 W. Va. 141–143. See *Beach* v. *O'Riley*, 14 W. Va. 55; *Moore* v. *City of Huntington*, 32 W. Va. —, (8 S. E. Rep. 512); *Kerr*

8

v. *Lunsford,* 32 W. Va. —, (8 S. E. Rep. 493). If the case pointedly turned on such a verdict, unconditional upon a demurrer to evidence, under the rule propounded by these authorities, rigid as they properly are, the verdict should stand.

Said witness, James Taylor, was asked if he was acquainted with the river from the Lavelle bridge to straightline bridge, and answered that he was well acquainted with it to that point, and clear on to Cairo. He was then asked: "The rise, you say, of 1886, injured you. Was the water below the Lavelle bridge out of its banks?" He answered : "I went from my house to Cairo two or three days afterwards, and could see the water marks all along. I did not see where it had been out of the banks any place except at Florence Smith's, where there is a very low place." This tended to show that the water was not out of the banks below, whereas it was above, the bridge, and that this was attributable to the bridge, and was admissible. John Hewitt was asked: "From your observation there, are you able to state, if that obstruction (meaning the addition to the abutments of the bridge) hadn't been placed at the abutments, would the water have been obstructed to the extent it was?" and answered: "No, sir."

If that answer is to be construed as saying the water would not have been obstructed to the extent it was but for the obstruction, it would be opinion evidence, and what is said above as to that part of James Taylor's evidence held improper would apply; but from the structure of the question it is not to be so construed, but as stating that he was unable to say as to the rise and obstruction,—in effect, no evidence on the matter.

Thomas Griffin, having testified to having seen material composed of stone, rock, and mud at the foot of the abutments, was asked whether or not it contracted the channel, and answered: "It does, to the best of my knowledge. That is my belief." I think this admissible under the rules above stated. This material being perceived by the eye, as was also the channel, I think he could say it contracted the channel. He was asked: "What company put those stones there?" and answered: "Baltimore and Ohio Railroad Com-

pany, or its employes." He was asked: "How long did those stones remain there?" and answered: "To the best of my knowledge, the biggest part of them until they were dug out for those additions to the abutments. I do not remember when they were removed, part of them; and the balance still remained there, and remains there till this time." He was asked what hands took out part of those stones in building the additions to the abutments, and answered: "Armstrong's men;" and was then asked: "Who was he working for?" and answered: "To the best of my knowledge he was working for the B. & O. R. R. Co."

Certainly it was competent for plaintiff to show the presence of those rocks in the channel; that defendant took part out and built the additions. Perhaps the objection is to the expression "to the best of my knowledge." Turning to this witness' entire evidence, of which the above is only an extract, we find that he had stated that he had himself worked for the Baltimore & Ohio Company; and helped the hands put those rocks there; and that no other company had worked on or managed that road. I think it was proper to go to the jury. The ground of his knowledge could be developed on cross-examination. A witness need not be positive, excluding all doubt, in his statement. He may state facts to the best of his knowledge, or his best impressions even, and the weight of his evidence is a matter for the jury. 1 Greenl. Ev. § 440; Whart. Crim. Ev. § 462.

The plaintiff stated as a witness that his mill had two French burrs, and that the wheat-burrs were cracked after the freshet. He was asked: "Did the water damage the burrs?" and answered: "I think it did. They were soaked in the water, and I had never seen the cracks before." I incline to think Taylor an expert, and his evidence admissible on this matter. *Bird's Case*, 21 Gratt. 800; *McCormick* v. *Hamilton*, 23 Gratt. 561. But at any rate, though opinion evidence, it bore only on the question of damages, and besides would not affect the result, under the principles above stated.

The judgment is affirmed, with damages according to law, and costs to the defendant in error.

Affirmed.