# CHARLESTON.

UHL v. OHIO RIVER RAILROAD COMPANY.

Submitted September 14, 1904—Decided December 13, 1904.

1.  WATER.—*Overflow When Part of Stream.*
    Overflow waters of a natural stream in times of ordinary flood or freshet, flowing over, or standing upon, the adjacent low lands, do not cease to be part of the stream, unless and until separated therefrom so as to prevent their return to its channel. (p. 506).

2.    RAILROAD.—*Negligence.—Obstruction of Water Flow.* .
      Failure of a railroad company to make culverts in an em-
      bankment constructed by it for its road bed, on lands subject to
      such overflow, of sufficient size to permit the water behind the
      embankment to rise and fall as fast as the stream does, is neg-
      ligent and unskillful construction, making the company liable
      in damages for resulting.injury.   (p. 508).

3.    VERDICT.—*When not Disturbed on Appeal.*
      When no objection, by motion to set aside or otherwise, has
      been made, in the trial court, to a verdict rendered, subject to
      the action of the court upon a demurrer to the evidence, it can-
      not be disturbed in the appellate court, on the ground of exces-
      siveness of paucity of damages.   (p. 509).

Error to Circuit Court, Wood County.

Action by Winnie Uhl against the Ohio River Railroad Com-
pany.   Judgment for plaintiff.   Defendant brings error.

*Affirmed.*

J. W. VANDERVORT, and VAN WINKLE & AMBLER, for plain-
tiff in error.

V. B. ARCHER and WM. BEARD, for defendant in error.

POFFENBARGER, PRESIDENT:

This case calls upon the Court to say whether injury to real
estate resulting from interference with the overflowing waters
of a navigable river, at a point outside of its banks, by means
of an embankment, gives a right of action for damages.   There
is practically no controversy as to the facts and, in all material
respects, the question is one of law.   The defense is predicated
mainly upon three propositions:   First.   That such waters are
deemed to be surface waters.   Second.   That even if, by the
common law, such waters in England constitute part of the
river, the rivers of this country, by reason of their size and char-
acter as great navigable bodies, would, on the general principles
of that law, be excepted from the rule, and classed with the
waters of the sea.   Third.   That the overflow was the result of
an extraordinary rise in the river, the consequences of which the
defendant was not bound to anticipate or provide for in the con-
struction of its embankment.

Winnie Uhl was the owner of a lot, situated in the town of

Williamstown on the Ohio River, with a frontage of thirty-seven feet on a street running practically parallel with the river, and lying between the lot and the river. From the street the lot falls away into a depression, in the lowest part of which there is a small channel in which, during part, or all, of the time, there is a stream of water, fed by springs, which carries, in addition to the water from the springs, the surface water from the basin. Passing on below the limits of plaintiff's property, this depression reaches the river at some point not far distant. The defendant located its railroad on the street in front of plaintiff's property, and, passing on down the river, crossed the depression a short distance below it. In the construction of its road the defendant threw up an embankment in the street in front of plaintiff's property, the top of which is three feet above the level of the lot and maintained it at about the same heighth to a point beyond the depression. At the crossing of the drain, the elevation is ten to fifteen feet, and, at that point, a small opening is made in the fill, called a culvert. The culvert is three feet square on one side and eighteen inches by two feet on the other. It is sufficient to carry the waters accumulating in the drain from the springs and from the surface, but insufficient to let in the waters from the river, when rising, fast enough to make the rise in the basin keep pace with that of the waters of the river, and to allow the waters in the basin to subside, when the river is falling, as fast as the river goes down. In the flood of 1898, this resulted in the injury complained of. The river rose rapidly and attained a very high stage. When the river reached the top of the railroad company's embankment, the water in the basin had not attained that height by about seven feet, according to the testimony of witnesses, and the waters from the river flowed over the embankment and fell upon the plaintiff's premises, tearing up and washing away the soil, undermining the foundations of buildings, flooding a cellar, loosening from its anchorage a frame building, called a cooper shop, containing tools, materials and barrels, and causing the same to float and finally to be carried away. When the river subsided, the outflow of the waters in the basin was so impeded by the embankment, with its insufficient culvert, that water remained upon the lot much longer than it would have done but for the interference of the embankment.

In order that the discussion of the main proposition may be unembarrassed by any consideration of the rules of pleading, the action of the court in overruling the demurrer to the declaration will be passed for the present.

The space taken up in the briefs with the discussion of the distinction between the principles of the common law and the Roman civil law, governing the rights of parties in respect to surface waters, and of the decisions in those states which have adopted the principles of the civil law on that subject, serves the purpose of a caution to the Court to observe that distinction in attempting to analyze the cases as reported and deduce from them rules and principles applicable to the questions here presented. In *Neal* v. *Railroad Co.*, 47 W. Va. 316, *Jordan* v. *Benwood*, 42 W. Va. 312, and other cases, this Court declares the common law rule on the subject of surface waters to be the law of this State. By that law the owner of property may consume the surface water of his premises, or obstruct or divert the flow of it, without incurring any liability to his neighbor whether above or below him, although he may be injured by the act; provided that the interference does not amount to a collecting of the surface water on his own land into a body and discharging it as such upon his neighbor's premises. See *Gillison* v. *Charleston*, 16 W. Va. 383; *Knight* v. *Brown*, 25 W. Va. 808; *Railroad Co.* v. *Carter*, 91 Va. 587; Gould on Waters, section 271; *Field* v. *Inhabitants*, 36 N. J. Eq. 118.

Neither the decided cases nor the text-books point out any material distinction between the two systems of law respecting the rights of riparian owners as regards natural water courses. Hence, if the waters of a river which spread over the adjacent low lands in times of freshets and floods, are not surface waters within the meaning of the common law, as to which only that law departs from the principles of the civil law, but remain part of the stream, there is no basis in reason or law for any conflict in the decisions, respecting the rights of riparian owners as to property affected by such water. As the Roman civil law makes no distinction between the waters of natural streams and surface waters, it is reasonable to assume that the courts of those states which have adopted it, would be uninfluenced, in classifying waters and determining what are, and what are not, surface waters, by any insensible bias or prejudice, such as might

induce courts of the other states to include in surface waters what does not properly belong to that class. But as the distinction is usually comparatively unimportant in those courts, it may be assumed that they have not bestowed upon the subject as much care and labor as have the courts that observe the other rule. Making due allowance for all this, we are disposed to avail ourselves of such light on the question as those decisions may afford.

In Ohio, the civil law is followed. *Buttes* v. *Peck,* 16 O. St. 334; *Tootle* v. *Clifton,* 22 O. St. 247. The supreme court of that state, in *Crawford* v. *Rambo,* 44 O. St. 279, declines to consider overflowing waters of a river as surface water. In the opinion, at page 282, Minshall, Judge, says: "It is difficult to see upon what principle the flood-waters of a river can be likened to surface water. When it is said that a river is out of its banks, no more is implied than that its volume then exceeds what it ordinarily is. Whether high or low the entire volume at any one time constitutes the water of the river at such time; and the land over which its current flows must be regarded as its channel, so that when swollen by rains and melting snows it extends and flows over the bottoms along its course, that is its flood channel, as when, by droughts, it is reduced to its minimum, it is then in its low water channel. Surface water is that which is diffused over the surface of the ground, derived from falling rains and melting snows, and continues to be such until it reaches some well defined channel in which it is accustomed to, and does flow with other waters, whether derived from the surface or springs; and it then becomes the running water of a stream, and ceases to be surface water."

Georgia is classed as a state in which the rule of the civil law is adhered to, though the court has made no express declaration to that effect, and, in *O'Connel* v. *Railway Co.,* 87 Ga. 246, Lumpkin, Judge, in an able opinion, expressly repudiates the theory that such waters are surface waters within the meaning of either the civil or the common law, and the decision of the case rests upon that ground. In the opinion, at page 253, it is said: "The surplus waters do not cease to be part of the river when they spread over the adjacent low grounds, without well-defined banks or channel, so long as they form with it one body of water eventually to be discharged through the channel proper."

In Missouri, the common law was at one time rejected, in so far as it relates to surface waters, and afterwards, adopted. In *McCormick* v. *Railroad Co.,* 57 Mo. 433, and *Shane* v. *Railroad Co.,* 71 Mo. 237, it was held that an owner of land could not stop the natural flow of surface water or divert its course so as to throw it upon the land of his neighbor. In the latter case, the court held that: "Overflowing water from a river in time of flood, is surface water within the meaning of this rule." The decision was by a divided court and the opinion somewhat inconsistent, as declared in the case next to be noticed. The principle of these two cases was discarded in *Abbott* v. *Railroad Co.,* 83 Mo. 271. This was a case of obstruction to a natural watercourse by the erection of a bridge, but the second count in the petition charged an interference with the surface waters "which fell and ran down from higher ground," and the case did not concern the overflow of the river.

The Minnesota court, up to 1888, did not seem to have taken any position with reference to the two systems of law, and, in *Byrne* v. *Railroad Co.,* 38 Minn. 212, it is expressly held that: "The water which in times of ordinary high water overflows the banks of a stream, and is accustomed to flow down over the adjacent lowlands, in a defined stream, is subject to the law relating to water-courses, rather than to that of surface water." This implies a leaning toward the common law rule, otherwise it would be unnecessary to note any distinction between the two kinds of water. In Oregon, the court, without considering the doctrine of dominant and servient heritage of the civil law, respecting surface water, held that: "A stream does not cease to be a water-course and become *mere surface* water because at certain points it spreads over a level meadow several rods in width, and flows for a distance without defined banks before flowing again in a definite channel." *West* v. *Taylor,* 16 Ore. 165.

In Iowa, the court seems to lean toward the rule of the civil law and in *Sullens* v. *Railroad Co.,* 74 Ia. 659, it is held that where, by building an embankment across a wide creek bottom, a railroad company caused the surface water of the bottom to flow into the channel and then to leave it far above the culvert and flow over plaintiff's land, and then be turned back into the channel again above the culvert, the water was no longer to be considered surface water. This seems to have been nothing more

than an interference with a natural water-course. The embank-
ment and curvert caused the creek to leave its course and spread
over the land and then go back into its course. Hence, the decision
has very little bearing on this question. In *Moore* v. *Railway
Co.,* 75 Ia. 263, the court decides that water which, in the time
of a freshet, leaves the channel of a stream and spreads over the
bottom land, and is forced back into the channel again by a rail-
road embankment built across its course, is not to be regarded
as surface water in considering the sufficiency of the culvert
constructed in the embankment. This seems to be another case·
of mere obstruction to a natural water-course.

Coming now to the decisions of courts which apply the princi-
ples of the common law in determining the rights respecting
surface water, we find that in Indiana it has been held in more·
than one case that the waters of a river spreading over depres-
sions in the land in the time of a flood are held to be surface·
water. *Turnpike Co.* v. *Green,* 99 Ind. 205; *Railroad Co.* v.
*Stephens,* 73 Ind. 278.

In New York, the surplus water of a stream when flooded is·
undoubtedly regarded as a part of the stream. Thus, in *Wallace*
v. *Drew,* 49 Barb. 413, it is held that: "It is well settled that
every person through whose land a stream of water flows may·
construct embankments and other guards on the bank, to pre-
vent the stream washing the bank way and overflowing and in-
juring his land. But in doing this, he must be careful so to·
construct them as not to throw the water upon his neighbor's
lands, where it would not otherwise go, in ordinary floods;
otherwise he will be liable for the injury. But this rule does
not apply to floods altogether extraordinary and unusual." This
proposition was adopted from Angell on Water-Courses, section
334, and that work adopts it from *Rex.* v. *Trafford,* 1 B. & Ad.
874, a case to be noticed later on.

Though not exactly in point, *Burwell* v. *Hobson,* 12 Grat.
322, is said to bear upon the question and tends strongly to up-
hold the view that flood waters are to be considered a part of the
stream. The syllabus reads as follows: "H. owning lands on
both sides of a creek which frequently overflowed its banks, built
a dike along the south side of it, to protect his low grounds on
that side of the creek; and this caused the creek to overflow the
land on the north side still more. At his death his lands were·

divided by commissioners, who allotted to one of his children the land on the south side of the creek, and to another, W. the land on the north side. And in their report they made no allusion to the dike. The son receiving the land on the south side of the creek, afterwards sold it to B; and then W. owning the land on the north side, commenced to build a dike on that side, to protect his lands, which would have the effect to destroy the dike built by H. and overflow the low grounds on the south side. B. then filed a bill to enjoin the building of the dike on the north side. *Held:* (1) B. is entitled to have his dike as it was when H. died, and to have his lands protected thereby; and W. has no right to build a dike on his side of the creek, which would destroy the dike of B. and overflow his low grounds. (2) Equity will interfere to prevent the building of the dike; and will compel W. to abate so much of his dike already built as would injure the dike and low grounds of B." This case follows the principle laid down in Angell on Water-Courses, just referred to, and is based upon the English decisions. It is urged that the embankment, made by the ancester, was not for the purpose of controlling the flow of the water when the stream was within its banks, but only to protect certain land when it overflowed its banks. By this dike he had thrown the water to one side of the stream and left the land on that side to his son subject to the burden of the surplus water. While owner of the entire tract, the ancestor had altered the course of the stream on his own premises, as he had a clear legal right to do, Gould Wat. section 213, but, after the division of the estate, neither of the several owners could so interfere with the stream as to injure the other. When, by the counter dike, the superabundant waters of the flood stage were confined within the channel, caused to overflow land on the opposite side, and kept off the land, the court declared the act to be an actionable obstruction of the stream and not a mere rightful repulsion of surface water.

The claim of analogy between the case of *Burwell* v. *Hobson* and the case now in hand seems to be sustained by the views of Judge Moncure, in applying to that case the principle declared in *Rex.* v. *Trafford,* 20 Eng. C. L. 498, in which the overflowing waters of a stream formed the subject matter of the controversy. Embankments, called fenders, had been erected by the owners of lands bordering on a stream, to prevent it from

overflowing their lands in times of freshets and floods. These embankments were increased in height, from time to time, and finally resulted in throwing such a large body of water into the channel of a river into which the brook emptied, that it endangered certain canal banks and aqueduct and obstructed navigation in the canal. Neither the aqueduct nor the canal banks was in any degree the cause of the overflow. It had occurred before the erection of the canal and in times beyond the memory of man. Arches had been made in the aqueduct at points distant from the river to permit this overflowing water to pass through it. Upon the special verdict showing all the facts, the court of King's Bench held: "That the defendants were not justified under these circumstances, in altering for their own benefit the course in which the floodwater had been accustomed to run; that there was no difference in this respect between floodwater and an ordinary stream." In the opinion, Lord Tenterden, C. J., said: "The consequence of a judgment requiring the fenders to be reduced, may be the production of much mischief in times of flood, not only to the lands of the defendants, but also to a considerable tract of country, unless some other method can be found of carrying off the flood water. But this consequence cannot be properly attributed to the erection of the canal, as any blame either in its projectors or present proprietors. On the contrary, it distinctly appears, that at the formation of the canal a sufficient provision was made for carrying off the flood water in the course which it had previously taken, by the erection of the three arches; and these arches would continue to be sufficient, notwithstanding any increase of water by the improved drainage of the country above, if the ancient course and outlet of the flood water had not been obstructed by the erection of the fenders. Now, it has long been established, that the ordinary course of water cannot be lawfully changed or obtsructed for the benefit of one class of persons, to the injury of another. Unless, therefore, a sound distinction can be made between the ordinary course of water flowing in a bounded channel at all usual seasons, and the extraordinary course which its superabundant quantity has been accustomed to take at particular seasons, the creation and continuance of these fenders cannot be justified. No case was cited, or has been found, that will support such a distinction." In *Burwell* v. *Hobson,* Judge Moncure says the King's Bench

judgment in *Rex* v. *Trafford* was reversed in the Exchequer Chamber, "but that court agreed in the principle laid down by the court of King's Bench, though it did not discover upon the special verdict, a finding of sufficient facts to warrant its application to the case."　•

*Lawrence* v. *Railroad Co.*, 71 Eng. C. L. 643, deals expressly with the subject of flood waters as affected by a railroad embankment. The facts were such as to make it identical in principle with the case now in hand. They are stated by Patteson, Judge, as follows: "The plaintiff, ＊ ＊ ＊ brings this action for an injury to his land by its being flooded, as he alleges by the fault of defendants in constructing their railway across the lands of other persons without leaving sufficient openings for the passage of flood water, whereby they were obstructed and penned up and forced upon the lands of the plaintiff." In the opinion, he says: "The railway passes across the low lands adjoining the river Dun, over which the floodwaters of that river used to spread themselves. Those low lands were separated from the plaintiff's land by a bank constructed under certain drainage acts, and which protected the plaintiff's lands from floods. By the construction of the defendant's railway without ·sufficient openings, those floodwaters could not spread themselves as formerly, and were penned up, and flowed over the bank on the plaintiff's land. *Prima facie* this would give the plaintiff a cause of action; and the question is whether the Company are proctected by their act." The court held: "That, although the Company were not required by their act to make flood openings to their embankment, and would not be compellable by *mandamus* to make them, yet, as they might, by proper caution, have prevented the injury sustained by the plaintiff, an action on the case was maintainable against them for such injury." This means that the act of constructing the embankment was not wrongful because the act of Parliament had authorized it, just as we hold now that the construction of a work of internal improvement, authorized by law cannot be enjoined or controlled by the court, but that the company constructing such works, is answerable to the land owner for such damages as may result to him, and particularly for damages resulting from negligent or unskillful construction of the work, *Arbens* v. *Wheeling &c Co.*, 33 W. Va. 1; *Mason* v. *Bridge Co.*, 17 W. Va. 396; *Spencer* v. *Railroad Co.*, 23 W. Va. 406. By saying

that *prima facie* this would give the plaintiff a cause of action, the judge meant that if the construction of the railroad had not been a public work, authorized by law, it would have been wrongful and the embankment might have been abated as a nuisance.

These English decisions must be accepted as being declaratory of the common law. They were adopted and approved as correctly announcing the law by the Virginia court prior to the division of the state. The interpretation put upon them by that court must be accorded great weight here, because the Virginia decisions rendered prior to the division of the state are as binding upon this Court as its own decisions. The two cases above referred to deal with the flood water of streams, and apply the same principles to it that are applied by the common law to natural water courses themselves. They utterly preclude the assumption that such waters are surface waters, and class them with the waters of natural streams.

In some of the American cases in which ordinary flood waters are held to be waters of the stream, stress seems to be laid upon the fact that the flood waters maintain a current and do not stand upon the ground as backwater, motionless as a pool. *Lawrence* v. *Railway Co.* seems clearly not to recognize any such distinction; for in the course of the opinion it is said the flood waters of the river used to spread themselves over the low lands, just as they do in this country, and that, by the construction of the railway embankment, they were prevented from spread· ing themselves as they had formerly done and flowed over the bank on to plaintiff's lands. This imports that, by the railroad embankments, the waters were confined to smaller limits and thereby raised to a higher level so that they overflowed the bank which had formerly been of sufficient height to protect plaintiff's land. At any rate, they are not referred to as waters flowing over the land outside of the banks of the river and maintaining a current.

The Indiana decisions are clearly at variance with the application of the principles of the common law made by the English cases. They recognize nothing as overflowing river water unless it flows practically all the time. Such waters as are alluded to in *Lawrence* v. *Railway Co.* and *Rex* v. *Trafford,* as flood waters flowing beyond the limits of the stream, are classed as surface waters, although they maintain a current over the

land. Thus, in *Taylor* v. *Fickas,* 64 Ind. 167, the court, in its opinion, at pages 172 and 173, says: "In the complaint before us, there is no averment of any watercourse, except, indeed by way of parenthesis, that the place, during floods, is a part of the Ohio river; but the facts averred clearly show that it is not upon the bed of the river, nor within its channel, nor between its banks; in short, that it is no part of a watercourse, but that the flow is over the entire surface of the land, is occasioned by temporary causes, and is not usually there. The rights of the appellee, therefore, are such as a proprietor may have in surface water, which, as we have seen, is a part of his land; and the injuries or inconveniences which the appellant is alleged to have suffered are such as arise from the changes, accidents and vicissitudes of natural causes."

The reason for this departure is found in the nature and situation of the lands of that state, for in the same case, which is referred to in subsequent cases as a leading case in that state, the court says: "The doctrine contended for by the appellant, applied to the vast alluvial regions—so generally level, subject to occasional inundations—bordering upon the Ohio River, and lying along other rivers and large streams within this State, would very much embarrass agricultural and general improvement, by preventing proprietors of lands from securing their fences by planting trees, or other permanent methods, and in some instances, perhaps, render large portions of our richest soil useless. While the owners of lands may not obstruct watercourses to the injury of others, they must be permitted to fence and cultivate their fields and improve their lands in the way which best subserves their interests, without being responsible for the accidents of floods, or the shiftings of surface water occasioned thereby, although some times slight and temporary, injuries may result therefrom to adjoining owners. These are accidents which must be borne alike by all." This sounds very much like a declaration of state policy, designed to facilitate the cultivation of vast areas of low and swampy lands, subject to frequent overflow, in the interest of the general welfare of the people of those sections of that country and of the whole state, but the situation may fully justify it as a necessary modification.

Though the flow or current of a watercourse is one of its pronounced characteristics, it is at variance with common knowledge and reason to say that only such water of a stream as is

perceptibly moving may be considered a part of it. When one stream, uniting with another, obstructs its flow by reason of its running bank full, while the other is low, and causes such other stream to be filled with back water, can it be said that, so long as the backwater stands, it is only surface water? Are all the motionless pools within the banks of a river, produced by the windings of its channel and current, to be called surface water? Nobody has ever ventured such an unreasonable suggestion. If it be conceded, that the running waters of an overflowing river on the low lands outside of its banks do not cease to be part of the river, as clearly they do not, what reason can be assigned for a distinction outside of the banks which cannot exist within them? The standing waters are supported and maintained by the great body of water forming the river. From bank to bank, surface to bed, within the banks and beyond them, as far as the water stands or flows, all the atoms or parts are, for their positions, interdependent and inseparably united save when absolutely severed. If, from the lowest point in the bed a large quantity should be removed, a subsidence of the entire surface would result, each particle finding a lower level by the law of gravitation. That part of the water which flows is simply seeking what the standing water has already found, its level. By nature, it is all one body, until severed in some way, and the law suggests no reason or principle upon which what clearly is not severed can be deemed to have been cut off.

No doubt such water often becomes so separated from the river as to justify its classification as surface water. On the low lands along our rivers, there are depressions having no outlets to the river or elsewhere, and in which, when filled, the water must stand until it passes away by evaporation through the air and percolation through the soil. These are filled by overflow in times of flood and, upon the recession of the river, are left full of water. This overflow water is thereby effectually severed from the waters of the river and, no doubt, becomes, under the decisions, surface water.

The suggestion that the rules governing the rights of riparian owners in respect to our great rivers should be different from those applicable to the small English streams is a novel one, not expressed by any of the decided cases. Shall they be likened unto the high seas merely because our public policy has classed them as navigable waters beyond the limits of tide water

while the English streams are not, and because we deny to
riparian owners any exclusive right to the bed or shores, incon-
sistent with the public right of navigation, as a matter of pub-
lic necessity and convenience in the interest of commerce and
the public welfare? If we did so, we would do it for a reason
other than that assigned as justification for embanking against
the waters of the sea, namely, that their breaking in upon the
land is due to unknown causes, and cannot be anticipated. They
suddenly come where they have never before been known to
occur and may never be repeated, unlike the floods of inland
streams, recurring year after year in obedience to well known
natural laws and causes. Everybody is bound to take notice
of them and as to them no man can be heard to set up his ig-
norance. ' The public nature of our natural streams argues the
exact contrary of the proposition suggested. Neither by em-
bankment or other structure can a riparian owner obstruct or
alter them to the injury of the public. The sea may be fenced
out to the utmost extent of man's ability and there will still re-
main ample room for the world's commerce, but a very small
obstruction may seriously impair the usefulness of a great river.

The tremendous extent and weight of the overflow of our
great rivers makes it all the more necessary to adhere to com-
mon law principles. A diversion of the course of these irresisti-
ble bodies of water results in great injury and possible disaster.
It is only because of their comparative slightness in quantity and
incapacity to do injury that the law allows the owner of land to
do as he pleases with the surface waters on it or that would
come to it. When he collects and forms them into a
body and thus makes them injurious and hurtful, the law pro-
hibits him from turning them upon his neighbor. The clearing
away of the forests by reason of which the streams rise higher
and more quickly than when the fallen leaves, moss and muck
held back the waters in the forests, and the draining of the
swamps and low lands, only emphasize this view. Of all these
changes, persons dealing with the waters of the river must be
deemed to have notice, too.

For the foregoing reasons, we conclude that the overflow
water of a river, at times of ordinary flood, whether standing
motionless on the adjacent land, or sweeping over it, do not
cease to be part of the river, unless so separated from it as to

prevent its return. From this it follows that by preventing the gradual rise of the water over plaintiff's lot, by damming it and raising its level so as to cast it down in the form of a cataract or waterfall upon her grounds, and thus causing injury which would not otherwise have occurred, is such an interference with the stream as, by the common law, gives a right of action, and the same legal result arises from the prevention of the outflow of the water from the basin, in consequence of which it remained upon the land longer than otherwise it would have remained there, unless the flood was extraordinary, an act of God. A larger culvert would have rendered the embankment uninjurious to plaintiff's property in these respects, and the failure to make it of sufficient size to carry the water is negligent construction. Though the defendant could lawfully build the embankment, in doing so, it was bound to use the engineering knowledge and skill ordinarily applied in the erection of such works. It must be carefully and skillfully done. *Taylor* v. *Railroad Co.,* 33 W. Va. 39.

Whether a flood is extraordinary is generally, though not always, it seems, a question of fact for the jury. *Railway Co.* v. *Gilleland,* 56 Pa. St. 445; *Brown* v. *Railway Co.,* 8 Am. & Eng. R. R. Cas. (New Series), 693. If, therefore, the evidence is such as would warrant a finding that the flood in question was not extraordinary, the demurrer to the evidence cannot be sustained on the theory that it was extraordinary, as the demurree is entitled to the benefit of all inferences of fact that may be fairly deduced from the evidence. *Garrett* v. *Ramsey,* 26 W. Va. 345; *Gunn* v. *Railroad Co.,* 47 W. Va. 676; *Mapel* v. *John,* 42 W. Va. 561. According to the evidence, the river is subject to frequent rises of varying height and rapidity. That of 1884 was higher than that of 1898. The water had been on a level with the street ten or twelve times in a period of fifty years. One witness says that of 1898 was an unusual flood, but a jury would not be bound to accept his opinion. The facts attending the rise in question were not shown to have been without precedent as in all cases in which great floods have been classed as acts of God, such as the Johnstown Flood, *Long* v. *Railroad Co.,* 147 Pa. St. 343, *Wald* v. *Railroad Co.,* 5 Am. Eng. R. R. Cas. N. S., 70, the flood of 1852, in the Congaree River, the greatest freshet ever known in that country, *Lipford* v. *Railroad Co.,* 7

Rich. S. C. 409, or that which submerged Chattanooga in 1867 and broke up all roads leading into it, and as to which the proof showed "beyond question that such a flood had never occurred" at that place "within the memory of man, the old inhabitants who had witnessed other remarkable overflows since 1826, never having seen such a one." *Railroad Co.* v. *David,* 6 Heisk, (Tenn.) 261, 19 Am. Rep. 594. The evidence shows variableness and irregularity in the rises to which the river is subject and one much higher than that of 1898 had occurred just about the time the road was built. Unlike the ocean tides, freshets and floods in streams are governed by no fixed rules as to volume or the time in the which they gather, and the facts disclosed by the evidence are not such as would call upon a jury to pronounce the flood extraordinary in character.

Practically all that is urged upon the demurrer to the declaration, not disposed of by the general principles already discussed, is that the declaration does not aver that the defendant constructed the embankment, nor the height attained by the water and the rapidity with which it rose. The amended declaration does aver the building of the embankment by the defendant, and no principle of pleading, requiring so much of detail as is suggested by the other objection, is referred to. A declaration need not set out evidential facts.

The jury fixed the damages at $362.00, of which $337.00 is for the cooper-shop and contents washed away, and $25.00 for injury to the surface of the lot. No objection to this finding was made in the trial court by motion to set the verdict aside or otherwise, but the plaintiff in error now insist that the judgment should be reversed because the embankment did not cause the loss of the cooper-shop with its contents, the water having been so deep it would have floated away anyhow, and because some of the tools and materials in it were the property of plaintiff's husband, he having purchased them. This is an exception to the action of the jury in assessing the damages, which cannot be made in the appellate court. Only the rulings of the trial court may be reviewed here. Upon the demurrer we can only say whether the evidence sustains plaintiff's right to the damages, for that is all the lower court considered. It was not requested to rule upon the correctness of the finding of the jury, as to the *quantum* of damages. Its action is a prerequisite to

the exercise of any jurisdiction by this Court. *Riddle* v. *Core,* 21 W. Va. 530; *State* v. *Phares,* 24 W. Va. 657; *Brown* v. *Brown,* 29 W. Va. 777; *Proudfoot* v. *Cleavenger,* 33 W. Va. 267; *Humphrey* v. *West,* 3 Rand 516; *Barrett* v. *Coal Co.,* 47 S. E. 154.

Seeing no error in the judgment, we must affirm it.

*Affirmed.*