# CHARLESTON.

## NEAL *et ux.* *v.* OHIO RIVER R. CO.

### Submitted Sept. 12, 1899—Decided Dec. 9, 1899.

1. WATER-COURSE—*Abstruction—Damage.*

   A water course consists of bed, bank, and water. Yet the water need not continually flow, as many streams are sometimes dry. There is a difference between a water course and an occasional outburst of water which, at times of freshet, from rain or snow, descends from the hills and inundates the country. To be a water course, it must appear that the water usually flows in a certain direction, and by a regular channel, with banks or sides. For obstructing or diverting a water course, and thereby damaging another, the party is liable. (p. 319).

2. SURFACE-WATER—*Abstruction—Damage.*

   Surface water is water of casual, vagrant character, oozing through the soil, or diffusing and squandering over and under the surface, which, though usually and naturally flowing in known direction, has no banks or channel cut in the soil; coming from rain and snow, and occasional outbursts in time of freshet, descending from mountains or hills, and inundating the country; and the moisture of wet, spongy, springy, or boggy land. For obstructing or diverting surface water, though damaging another, the party is not liable. (p. 319-320).

3. OWNER'S RIGHT—*Crop—Damage.*

   The owner of land, who has leased it to a tenant for a share of the crop, may sue for a tort of a wrongdoer damaging the growing crop. (p. 321).

Error to Circuit Court, Wood County.

Action by Paul and Sarah M. Neal against the Ohio River Railroad Company. Judgment for plaintiffs, and defendant brings error.

*Reversed.*

Moats & Peterkin, for plaintiff in error.

H. P. Camden, for defendants in error.

Brannon, Judge:

This is an action by Neal and wife against the Ohio River Railroad Company, in Wood County circuit court, resulting in a judgment for plaintiffs for two hundred and fifty dollars upon demurrer by defendant to the evidence.

1. It is claimed that there is a variance between the title as pleaded in the declaration and that shown in evidence. The declaration alleges the plaintiffs as ·seised and possessed of a tract of land, whereas a life estate is shown. That allegation is sufficient to admit evidence against a wrongdoer for tort for damage to any estate,—years, life, or fee. *Clay* v. *City of St. Albans*, 43 W. Va. 539, (27 S. E. 368). It would cover injury merely to the possession, or permanent to the fee. The deed for the life estate is dated after the building of the fill alleged as the cause of damage. That makes no difference, because plaintiffs were in actual possession when it was made, presumably under some kind of title, as possession is *prima facie* evidence of some title; but, further, that deed had been made when the damage happened, and action accrued from the actual damage, not from the making of the fill. *Henry* v. *Railroad Co.*, 40 W. Va. 234, (21 S. E. 863). No need to allege the life estate. An alleged ground of variance is that the declaration says that plaintiffs were seised of a tract of one hundred and forty acres of land, which by right they ought to have enjoyed free from overflow of the waters of a "natural run, stream, or creek," and that the company "made a fill across a channel or ravine, and the natural drain, run, or stream therein, through which channel or ravine there flowed a natural running stream of water, which stream of water and the channel aforesaid is the outlet for a pond on plaintiffs' land, and which stream

or drain arose easterly from said pond, and flowed through plaintiff's land, across or through the right of way of defendant company, and emptied itself in the Ohio river. And defendant so negligently made and constructed said fill that the waters which flowed down said natural water course could not escape and discharge themselves from the land of plaintiffs.'' It further alleged that the company failed to make an opening or outlet through the fill, by which alone the waters in said water course could discharge themselves, and thus caused the waters flowing down the water course to be diverted from their channel; and the waters were accumulated and spread over the land, and there remained for months, dammed up, injuring crops, pasture, shade trees, depositing sand, gravel, and debris, and causing a lake or pond of filthy water, from which arose sickening stench and foul vapors, rendering the plaintiffs and their family uncomfortable, and endangering their health. If it is intended by counsel to base this variance between allegata and probata on the theory that, while the evidence might show the outlet from the pond to the river across the railroad to be a water course, that section east of the pond is not so shown, I think it untenable; for if only the outlet from pond to river be a water course, in law, that would avoid variance, though the drains into the pond could not be so considered.

2. But I suppose the claim of variance is based chiefly on the theory that the declaration bases recovery on the obstruction of a water course, which would be ground of action, whereas the evidence shows no water course, but only surface water, the obstruction of which would not be actionable, though doing damage to the plaintiffs. This concerns the merits of the case. The subject of liability on account of obstruction of surface waters has been discussed in *Jordan* v. *City of Benwood* 42 W. Va. 312, (26 S. E. 266), 36 L. R. A. 519; *Yeager* v. *City of Bluefield*, 40 W. Va. 259, (21 S. E. 752); and *Clay* v. *City of St. Albans*, 43 W. Va. 539, (27 S. E. 368). In the first case it is said that the same rule of liability as to surface water applies to railroads as to individuals. So, 24 Am. & Eng. Enc. Law, 950. The common-law rule as to surface water, not the civil-law rule, prevails with us. By it, a railroad company is not

liable for obstructing what is merely surface water, though so doing injures another. Authorities just cited. Many decisions hold otherwise, but they are in states where the civil-law rule prevails. Therefore we must see whether the water obstructed in this case was only surface water or a water course. On this land, in a basin or depression, there had been always a pond, covering half an acre in natural state, used for watering stock, fed by water from rain and snow gathered over a considerable area, conducted from hills back of it by several ravines,—so to call them. This pond always had water in it. It had an outlet to the Ohio river by means of a channel cut by the water, through which, when too full, it discharged itself, twenty or twenty-five feet wide, where it ran under a trestle of the railroad before the fill was made where the trestle had stood. The channel was not deep under the trestle, having a wide space to spread out; but thirty yards from the trestle it narrowed, and the ravine or channel was very deep. This stream had been running under the trestle ten years, and had always been there. Great quantities of water came down from the hills through this pond; sometimes, in heavy rains, bringing down great stones and other debris. Before the fill was made, this water freely flowed into the river. The water in this pond covered, in natural state, half an acre, for the depth of three feet; and any rise would go off by the said outlet to the river. It was never dry. and, when rains or snow came, it received and discharged much water. I do not regard the four ravines or drains going into the pond as water courses. But how as to the pond and its outlet? "A water course consists of bed, banks, and water. Yet the water need not flow continually, and there are many water courses which are sometimes dry. There is, however, a distinction in law between a regular, flowing stream, which at certain seasons is dried up, and those occasional bursts of water which in time of freshet, or melting of ice or snow, descend from the hills and inundate the country. To maintain the right to a water course or brooks, it must appear that the water usually flows in a certain direction, and by a regular channel, with banks and sides. It need not flow continually, and it may at times be dry, but it must have a well-

defined and substantial existence." Ang. Water Courses,
§ 4. I regard the outlet from this pond as complying with
this definition. There was a quantity of water regularly
passing, considerable except in droughts, in one, and only
one, direction; not squandering and wandering over the
surface as surface water does. but in a defined channel,
over a bed, between banks,—through a channel cut by the
waters long ago. Justice Brewer is very accurate in say-
ing: "For a water course, there must be a channel, a bed
to the stream, not merely low land or depression in the
prairie over which water flows. It matters not what the
width or depth may be, a 'water course' implies a distinct
channel; a way cut and kept open by running water; a pas-
sage whose appearance, different from that of the ad-
jacent land, discloses to every eve, on a mere casual glance,
the bed of a constant or frequent stream, not a mere de-
pression; and such flow must be necessary to prevent the
flooding of a considerable tract of land." *Gibbs* v. *Wil-
liams,* 37 Am. Rep. 241. I do not see why this stream does
not fill this measure. Here was the pond, a material ele-
ment, made up by various incoming drains. Gould, Wat-
ers, § 263, says that "mere surface water may be said to
form a water course at the point where it begins to have a
reasonably well defined channel, with bed and banks or
sides, though the stream itself be very small, and the water
may not flow continuously, and surface water ceases to be
such after entering within the banks of a water course."
See 24 Am. & Eng. Enc. Law, 904. It seems to me that
this large quantity of water collected in this pond, and go-
ing from it as constantly as water came in the usual course
of nature, by a fixed channel, over a fixed bed, is not mere
surface water. It originated in rains. So do all streams.
But when it reached this pond it lost the character of sur-
face water. And it would seem to be a harsh rule that
would allow any one on the theory of its being only surface
water, to dam it up, and overflow and destroy his neighbor.
This water does not answer the definition of "surface
water;" that is, "waters of a casual and vagrant character,
which ooze through the soil, or squander themselves over
the surface, following no definite course. Though cus-
tomarily and naturally flowing in a known direction and

course, they have nevertheless no banks or channels in the soil and include waters diffused over the surface of the ground. When surface waters reach, and become part of, a natural water course, they lose their character as surface water, and come under the rules governing water courses." 24 Am. & Eng. Enc. Law, 896. Water coming no one knows whence, flowing no one knows just how, underground or on the surface, but not in any channel, either from rain or springs, in a direction no one can say. So, I conclude this was a water course. But suppose this were questionable. The company filled the trestle, and put in a culvert of tile, and thus recognized and treated it as a water course, and cannot now be heard to say that it is not a water course, and be exempt from liability for damming water on Neal's land, covering ten acres, for weeks or months; making a lake deep enough for a steamboat, and injuring sod and crops, and "firing" crops on additional land; injuring twenty acres of corn and some oats. The pond was thus made thirteen feet deep. The company cannot be justified in so doing, if in fault.

3. Is the company in fault? The evidence is conflicting. Deciding the case upon a demurrer to evidence, we find the company in fault: First: Because the tile constituting the water way placed by it was inadequate in size to carry off the water in heavy rains. Neal objected to it on that score at the time, and warned those inserting it that he would hold the company responsible for damage. Second. Because the tile was broken by rock and large, hard, dry lumps of clay thrown from dump cars upon it a height of twenty feet, so that it soon broke in and stopped —entirely closed—the passage of water. Neal opposed the company's going to the fill over the broken tiles, but the work went on. It is suggested, perhaps as variance, that a field was leased to a tenant for cropping in corn. Still, there was other land damaged to justify recovery. And that field was leased, the rent to be paid in a share of the corn, which entitled Neal to sue for damage to the corn. There was no evidence given of damage, beyond that to the enjoyment of possession; no damage to the freehold, as distinguished from that to the life tenant.

4. It is argued that this injury came from the act of

God, the rain being extraordinary. The evidence shows that it was very heavy, but not extraordinary,—only such as had before fallen, and such as was surely to be expected at times.

*Judgment Reversed.*

### ADDENDUM.

The evidence of Neal clearly shows that when the tiling was being put in he was present, and saw the tiling broken by the large lumps of hard clay and a large rock thrown from the dump cars upon the tiling, and that he protested against its being covered up in that condition, but the company's hands did cover the broken tile up, and that, the first rain that came, the tiling failed to carry off the water, but it worked its way through ultimately; that the next heavy rain, the slight opening that had slowly and poorly carried off the water became entirely closed, and the tiling carried off no water, which resulted in the great lake of water spoken of in the foregoing opinion, standing there many days, causing the damage sued for. That lake was three feet higher than the back water of the Ohio river at its highest, showing that that backwater did not do the damage. That is beyond question. Under a demurrer to evidence, we cannot exclude this evidence of Neal; but I make this note,—that the undisputed physical facts say that Neal tells the truth. That water lay there long after the Ohio fell. Who believes that it would have done so, had the passage through the tile been open? That it was not open, no one disputes. When did it close? Is it likely that the mere weight of earth on this tiling broke it down after it was put in? It is not. But does not the fact, which is beyond dispute, that it was found broken, and would not carry water, conclusively confirm the statement and claim of Neal that it was in a damaged condition when put in? Under these known physical facts, it is utterly unreasonable to say that Neal falsifies. This condition of the tile alone renders the company liable, even if we say that the tile was of sufficient size to carry the water away, had it not been broken.