JOHN McCAUSLAND

*v.*

DANIEL R. JARRELL, *et al.*

(No. 10355)

Submitted September 25, 1951. Decided December 11, 1951.

570

LOVINS and GIVEN, JUDGES, dissenting

·William H. Rardin, Jackson, Kelly, Morrison & Moxley, and David D. Johnson, for appellant.

A. G. Mathews, Oliver D. Kessel, for appellees.

HAYMOND, JUDGE:

This suit in equity was instituted in the Circuit Court of Mason County, in December, 1949, by the plaintiff, John McCausland, the owner of a large tract of land on the Great Kanawha River in that county, to compel the defendants, Daniel R. Jarrell and Martha E. Jarrell, his wife, the owners of a tract of land adjoining and lying west of the plaintiff's land, to reopen a small stream of water on the land of the plaintiff which continued upon and over the adjoining land of the defendants until the flow of the stream was allegedly obstructed by the acts of the defendants, in the year 1948, in raising the elevation of a farm lane in the path of the stream on the land of the defendants to a height of approximately two or three feet above its former level, and in improperly diverting the water of the stream by the construction of an allegedly inadequate drain on the land of the defendants along the east side of the lane as so elevated and between it and the land of the plaintiff, connecting with the stream on an angle and continuing for a distance of approximately 288 feet, which alleged obstructions, the plaintiff charges, cause the water from the stream to overflow, accumulate, remain upon, and damage the land of the plaintiff, and to

SKETCH OF DRAINAGE AREA
PART OF JOHN Mc CAUSLAND FARM
MARCH 31, 1949          SCALE 1"= 100'
J. MILTON LEWIS R.P.E. NO. 507

obtain a permanent injunction to prevent the defendants from obstructing the flow of the water in the natural course of the stream.

The case was heard by the circuit court upon the bill of complaint and its exhibit, the answer of the defendants, the general replication of the plaintiff, and the depositions of witnesses taken and filed in behalf of the respective parties. The circuit court by final decree, entered September 5, 1950, denied the plaintiff the relief prayed for in his bill of complaint and dismissed the suit at the cost of the plaintiff. From that decree this Court granted this appeal upon the application of the plaintiff.

The plaintiff is, and has been since 1907, the owner of about 1,255 acres of farm land on the south bank of the Great Kanawha River near Point Pleasant, in Mason County, of which land approximately 500 acres are bottom land between State Route 17 and the river. The defendants are likewise the owners of a farm of 463½ acres, composed of two tracts of land, adjoining the farm of the plaintiff on the west, one of which tracts of land they purchased in 1944 from persons named Meadows who had previously owned it for many years. Both farms are traversed by State Route 17, running generally from east to west, and on the adjoining bottom land of the defendants is a farm lane, which extends northeast from State Route 17 to the river. This lane has existed since about 1902 and its eastern edge runs near the boundary between the two farms. A map from a survey, made in March, 1949, introduced in evidence with the testimony of the surveyor, is here inserted in this opinion.

From this map it appears that there are two small streams or creeks, flowing in a northeasterly direction, which cross under State Route 17 and run through the land of the plaintiff toward the Great Kanawha River. One of them, crossing State Route 17 at the point designated B on the map, rises on the farm of the defendants, enters the farm of the plaintiff near the point designated C, and unites with the other stream at the point desig-

nated D. The other stream, which crosses State Route 17 at the point designated A, originates in part upon the hills of the plaintiff's farm and in part on the hilly section of the defendants' farm, unites with the first mentioned stream on the plaintiff's land at the point designated D, and the single stream formed at that place extends, in a northeasterly direction, a distance of about 400 feet to the point designated E, where it divides into two branches, one of which continues on a curve to and beyond the point designated G, distance about 610 feet from the point designated E, and the other of which runs on an angle in a nearly straight line from the point designated E to the point designated F, which last mentioned point is located near the edge of the farm lane about 500 feet to the west of the point designated E and 288 feet south of the point designated G. The section of the stream from the point designated E to the point designated F, on the plaintiff's farm, is the stream involved in this suit and the water passing through it prior to the year 1948 flowed into a culvert formerly located in the farm lane and passed under or over the lane to and upon the land of the defendants where part of it accumulated and formed a swamp or a small pond from which, according to the testimony of the plaintiff, a drain extended to another stream known as Five Mile Creek. The dimensions of the two streams which cross State Route 17 at points A and B respectively, as designated on the map, are not clearly established by the evidence, but it appears that the stream which follows the course from points A to D, where it joins with the stream which follows the course from points C to D, is the larger of the two streams, and that the section of the stream from points E to G is larger than the branch which flows between points E and F. It also appears that the branch of the stream from point E to point F is approximately two or three feet in depth.

In July or August, 1948, the defendant, Daniel R. Jarrell, caused the elevation of the farm lane to be raised, by filling it with dirt, to a height of approximately two or three feet above the former level of the lane in the area

near the point F. In the construction of the fill on the lane a culvert which had previously existed at point F for many years, and through which the water flowing from points E to F had passed under the lane, was destroyed or completely closed; and the elevation of the lane to its present level prevents the flow of the water of the stream across the lane and to and upon the land of the defendants. Since the fill was constructed, because of its stoppage of the flow of the water at the point F, the portion of the land of the defendants, where the swamp was formerly located, has become dry land. When the elevation of the lane was raised, the defendant, Daniel R. Jarrell, also caused the construction of a ditch or drain two hundred and eighty eight feet in length, approximately two feet in width, and about eight inches in depth, on the land of the defendants, between the lane and the land of the plaintiff along the side of the lane from the point F to the point G. The plaintiff testified that the size of the ditch or drain is not as large as the section of the stream between points E and F, does not dispose of the normal flow of the water, and causes it to "back up" in the general area at point F. The elevation of the section of the stream between points E and G is 2.37 feet lower at point G than at point E; the elevation of the section of the stream between points E and F is 1.8 feet lower at point F than at point E; and the elevation of the ditch or drain between points F and G is .57 of a foot lower at point G than at point F. The plaintiff contends that the ditch or drain from point F to point G is inadequate to carry the water of the stream which formerly flowed across the lane at point F, from that point to point G, and that as a result of the elevation of the lane and the removal or the closing of the culvert, the water from the stream overflows, accumulates and stands upon his land. On the contrary, the defendants contend that the ditch or drain between the points F and G is adequate to carry, and does carry, the water from the stream at point F to the other section of the stream at point G, and furnishes sufficient drainage of the water from the land of the plaintiff.

The culvert which formerly existed at point F had been located at that place from at least the year 1902 until the level of the lane was raised in 1948. Until about the year 1935 it consisted of a wooden box or square about twelve inches in width, and at that time it was replaced by a corrugated metal pipe which was installed at the direction of a former owner of the land of the defendants.

The plaintiff and several other witnesses in his behalf testified that the branch of the stream which extends from point E to point F has been in continuous existence as long as any of them had known or been acquainted with that section of the land of the plaintiff and the various periods of time that each of them had been familiar with the land and the character of the stream ranged from 13 to 47 years before the elevation of the lane in 1948. All of them also testified to the existence of the culvert at the point F and the previous flow of the stream through it or across the lane to the land of the defendants. The plaintiff and these witnesses further testified that the water from the branch of the stream from point E to point F did not flow from the land of the plaintiff by means of the ditch or drain from point F to point G in the same manner or to the same extent as it flowed from the land of the plaintiff before the elevation of the lane, and that the water from the stream overflowed, accumulated, and stood upon the land of the plaintiff after the lane was raised. The defendant, Daniel R. Jarrell, testified that he was unacquainted with the land of the plaintiff before the defendants purchased their land in 1944 and that at that time there was no stream between points E and F. One witness in behalf of the defendants testified that only about ten or twelve feet of the section of the stream between points E and F existed when he formerly worked on the land of the plaintiff, and that, sometime in 1944, he dug the ditch, to a depth of about two feet, from the point where it then ended to the point F. This witness, however, testified that a culvert existed under the lane at the time and a witness for the plaintiff contradicted his statement concerning the digging of the ditch. Another witness in behalf of the defendants who was well acquainted

with the land of the plaintiff also testified that he could not recall any stream running from point E to point F; but this witness likewise testified that there had been a culvert under the lane at point F. Several witnesses, produced in behalf of the defendants, testified that the ditch or drain between points F and G was sufficient to drain the water of the stream between points E and F and that after it was constructed the drainage of the land of the plaintiff was better than it was before it was constructed.

In 1933, and for some time afterward, the section of the land of the plaintiff near the points E and F was a thicket which contained underbrush and small trees, but before the institution of this suit the thicket in that area was removed and that section of the land has been planted with grass, and is used to some extent by the plaintiff for pasture. Photographs taken at the instance of the plaintiff and introduced in evidence show that the area between points E and F though containing some trees is cleared of underbrush, and that in February, 1949, portions of the land of the plaintiff near the point F and east of the farm lane were covered with standing water. The bottom lands of the farms of both the plaintiff and the defendants are subject to inundations from flood waters of the Great Kanawha River which ordinarily occur once or twice in each year.

The plaintiff bases this suit, and seeks to obtain the relief for which he prays, on the theory that the section of the stream between the points E and F is a natural watercourse which the defendants have obstructed to the extent of causing the water of the stream to overflow, accumulate, stand upon, and damage his land and that the water which flowed from the stream across the farm lane and upon the land of the defendants before the lane was raised to its present level was not surface water but water from the stream which flowed in its natural course. That issue and the issue whether the plaintiff had also acquired an easement by prescription on the land of the defendants for the flow of the water were presented to but not

specifically decided by the circuit court. In denying the plaintiff the relief prayed for in his bill of complaint the judge of the circuit court filed a written opinion, which is made a part of the record, and the opinion contains, among others, these statements:

"I am unable to conclude that the drain or stream from 'E' to 'F' is a natural water course, although it be conceded that it has been in existence for many years. The whole evidence in the case strongly indicates that this drain originated some years ago but whether it is natural or artificial remains in doubt. There can, however, be no possible doubt that the stream from 'D' to 'G' is a natural one—all the evidence is clear upon this point.

"It is not necessary to decide whether the drain in question is natural or artificial or whether the plaintiff has acquired a prescriptive right to flow water upon the defendants' land. The fact is that point 'F' is 1.8 feet lower than point 'E', point 'G' is .57 feet lower than point 'F' and point 'G' is also 2.37 feet lower than point 'E', so that the flow of surface water would naturally drift toward point 'G' from any of the other points shown on the map. Since the defendants have a legal right to deal with the surface water deposited on their land at 'F', our only inquiry is as to the manner in which they dispose of it. * * *.

"The burden is upon the plaintiff to show not only that the defendants acted in an unreasonable manner but also he was damaged or likely to suffer damages therefrom. The law confers upon the defendants the right to take care of the water after it reached their land. Digging a drain from 'F' to 'G' to lead the water into the main stream at 'G' accomplished the threefold purpose of, (1) protecting their farm lane, (2) carrying surface water from the plaintiff's land all along the distance from 'F' to 'G' and, (3) protecting their land west of the lane from seeping and encroaching waters tending to create a swamp, swale, or slough in their own fields.

"In such case as this there is an equitable principle to be applied known as the balancing of equities or conven-

iences, between the parties to the cause. What equity dictates that the defendants should be ordered to install a culvert under this farm lane at 'F', and be compelled to dispose of the water on the west side of the lane instead of the east side as they did? To compel such an installation would either result in the water being discharged upon the defendants' land to stand in pools or swamps or else in the expenditure of money and labor in constructing drains or ditches to carry the water to Pond Branch on the east side of the lane. See 14 R. C. L. injunctions, Section 60, page 357 and *Chafin* v. *Gay Coal and Coke Co.* 109 W. Va. 453, 156 S. E. 47.

"From all the testimony there is no reason to doubt that the drain constructed by the defendants from 'F' to 'G', if properly cared for and maintained, is ample to carry the surface water on the east side of the farm lane. It has sufficient fall and if kept open will suffice for every reasonable purpose."

Though the quoted statements in the opinion of the circuit court concerning the character of the stream between the points E and F and the easement by prescription claimed by the plaintiff upon the land of the defendants indicate that it did not in express terms pass upon these questions, by its action in denying the plaintiff the relief which he seeks, upon the ground that the water which flowed through the culvert and over the lane to and upon the land of the defendants was surface water, a ruling which is entirely inconsistent with the theory of the plaintiff that it was the normal and usual flow of water from a natural watercourse, and in applying the doctrine of the balance of equities or conveniences, that court necessarily and in effect decided that the stream was not a natural watercourse and that the plaintiff had not acquired an easement upon the land of the defendants for the flow of the water from the stream. Whatever may be the effect of the statement of the circuit court that it was unnecessary to decide those questions, the provision in the final decree that "Upon consideration of all which, the court is of opinion and doth ADJUDGE, ORDER AND

DECREE that the plaintiff has not made out and sustained a cause of action against the defendants." clearly constitutes a decision adverse to the contentions of the plaintiff on both of those questions and enables this Court to review them upon this appeal.

By his assignments of error the plaintiff seeks reversal of the final decree of the circuit court on substantially these grounds: (1) the section of the stream between points E and F is a natural watercourse and the water flowing from it is not surface water; (2) the plaintiff has an easement by prescription upon the land of the defendants for the unobstructed flow of the water of the stream; (3) the obstruction and the diversion of the natural flow of the water of the stream are unlawful and unreasonable; and (4) the plaintiff is entitled to an injunction as prayed for in his bill of complaint.

The evidence clearly shows that the section of the stream between the points E and F had been in continuous existence, in substantially its present condition, for many years and that it was created by nature and not by human work or effort. Though one witness produced by the defendants testified that he dug that portion of the stream extending from a point ten to twelve feet west of the dividing point E to the point F in the year 1944 his testimony is flatly contradicted by the testimony of another witness, and is against the clear weight and preponderance of the evidence on that point. The stream, as it existed in 1948 before the level of the lane was raised, and as it now exists between the points E and F, consists of a well defined bed and bank and normally contains water that usually flows in a known direction and in a regular channel. In *Neal v. Ohio River Railroad Company,* 47 W. Va. 316, 34 S. E. 914, in defining a natural watercourse and in referring to the liability of a person who obstructs or diverts it, this Court said in point one of the syllabus "A water course consists of bed, bank and water. Yet the water need not continually flow, as many streams are sometimes dry. There is a difference between a water course and an occasional outburst of water

which, at times of freshet, from rain or snow, descends from the hills and inundates the country. To be a water course, it must appear that the water usually flows in a certain direction, and by a regular channel, with banks or sides. For obstructing or diverting a water course, and thereby damaging another, the party is liable." The definition of a natural watercourse as stated in the *Neal* case, has been reiterated by this Court in the recent case of *Town of Paden City* v. *Felton*, 136 W. Va. 127, 66 S. E. 2d 280. See also 56 Am. Jur., Waters, Sections 6, 7, 8 and 9. The opinion of the circuit court states that there can be no possible doubt "that the stream from 'D' to 'G' is a natural one"; and no material fact, established by the evidence, differentiates from that section of the stream the character of its branch, which begins at the dividing point E and, until the lane was raised, extended beyond the point F across the lane and to and upon the adjoining land of the defendants where it formed a swamp or pond from which the water continued to flow, according to the testimony of the plaintiff and another witness, into or toward another stream known as Five Mile Creek. A natural watercourse implies a place of discharge and ordinarily empties into a river or another watercourse, but if a stream spreads out on land and there terminates, that fact does not deprive the part of the stream which flows regularly through a channel of its character as a natural watercourse. 56 Am. Jur., Waters, Section 10; *Rait* v. *Furrow*, 74 Kan. 101, 85 P. 934, 6 L. R. A. (N.S.) 157, 10 Ann. Cas. 1044; *Rigney* v. *Tacoma Light and Water Company*, 9 Wash. 576, 38 P. 147, 26 L. R. A. 425.

It is also manifest, from the evidence, that the flow of the stream is not surface water which is also defined by this Court in point two of the syllabus in the *Neal* case as "water of casual, vagrant character, oozing through the soil, or diffusing and squandering over and under the surface, which, though usually and naturally flowing in known direction, has no banks or channel cut in the soil: coming from rain and snow, and occasional outbursts in time of freshet, descending from mountains or hills, and

inundating the country; and the moisture of wet, spongy, springy, or boggy land." See *Uhl v. Ohio River Railroad Company*, 56 W. Va. 494, 49 S. E. 378, 68 L. R. A. 138, 107 Am. St. Rep. 968, 3 Ann. Cas. 201. The flow of water from the section of the stream between points E and F, not being surface water, the case of *Jordan v. City of Benwood*, 42 W. Va. 312, 26 S. E. 266, 36 L. R. A. 519, 57 Am. St. Rep. 859, cited by the defendants, which deals with the right of a land owner to dispose of surface water flowing upon his land, is inapplicable to the case at bar.

The principle is well established by the decisions of this Court that the owner of land through which a natural watercourse passes is entitled to the flow of the water of the stream as it is wont to flow by nature without diminution or alteration, that he may insist that the stream shall flow to his land in the usual quantity in its natural place, and at its natural height, that he is entitled to have it flow from his land to the land of his neighbor below in its accustomed place and at its usual level, and that a person who obstructs or diverts such watercourse and by so doing damages the land of the person through which such watercourse passes is liable to the owner of such land. *Roberts v. Martin*, 72 W. Va. 92, 77 S. E. 535; *Atkinson v. Chesapeake and Ohio Railway Company*, 74 W. Va. 633, 82 S. E. 502; *Pickens v. Coal River Boom and Timber Company*, 58 W. Va. 11, 50 S. E. 872, 6 Ann. Cas. 285; *Taylor v. Chesapeake and Ohio Railway Company*, 84 W. Va. 442, 100 S. E. 218, 7 A. L. R. 112; *Cline v. Norfolk and Western Railway Company*, 69 W. Va. 436, 71 S. E. 705; *Neal v. Ohio Railroad Company*, 47 W. Va. 316, 34 S. E. 914; *Hargreaves v. Kimberly*, 26 W. Va. 787. The right of the owner of land through which a natural watercourse passes to have the water of the stream pass his land in its natural flow is a property right and exists as part of the land; and the unreasonable diversion of the water of such stream is an infringement of such property right which imports damage. *Roberts v. Martin*, 72 W. Va. 92, 77 S. E. 535; *Allen v. Stowell*, 145 Cal. 666, 79 P. 371, 68 L. R. A. 223. The obstruction or the unreasonable diversion of the water of a stream is also a private nui-

sance. *Roberts* v. *Martin,* 72 W. Va. 92, 77 S. E. 535; *Humphries* v. *Black Betsy Consolidated Coal Company,* 115 W. Va. 768, 178 S. E. 273; *Allen* v. *Stowell,* 145 Cal. 666, 79 P. 371, 68 L. R. A. 223; 20 R. C. L. 401; 56 Am. Jur., Waters, Section 13. In 56 Am. Jur., Waters, Section 13, the text contains these statements: "It is a general principle of the law of waters, subject to certain exceptions and modifications * * * that a riparian proprietor has the right to have the water of the stream flow by or through his premises in its natural mode, course, and volume.", and that "As against riparian owners below, upper proprietors are entitled to have the water flow from their lands to the same extent, and such lower owners are bound to submit to receive it although it floods their lands." See 67 C. J., Waters, Section 13b, p. 690.

In *Roberts* v. *Martin,* 72 W. Va. 92, 77 S. E. 535, this Court held that the plaintiff, a lower riparian landowner was entitled to an injunction to prevent the defendant, an upper riparian landowner, from diverting from the land of the plaintiff a material part of the water from a small stream which ran through the lands of both owners and which the plaintiff used to operate a grist mill on his land, and in the opinion said:

"Plaintiff, whether he has a mill or not, and regardless of the fact that the mill has been operated on the stream for many years, is entitled as a riparian owner to have the stream which washes his land flow as it is wont by nature without diminution or alteration. He may insist that the stream shall flow to his land in the usual quantity, in its natural place and at its natural height, and that it shall flow off the land to his neighbor below in its accustomed place and at its usual level. While he has no property in the water itself, yet his right to the natural flow of the water will be regarded and protected as property. His right to have the water pass his land in its natural current is not an easement or appurtenance; but it is a right annexed to the soil which he owns. The right exists *jure naturae* as parcel of the land. Gould on Waters (3rd Ed.), sec. 204; Pomeroy on Riparian Rights,

secs. 7-9. The flow of the water in its natural way and at its natural height is a part of plaintiff's landed estate. Interference with the flow is the infringement of a property right of plaintiff for which he may have redress as readily as for violation of his right to any other portion of the soil.

"Defendants, by their act in taking the water, are clearly infringing the right of plaintiff as a riparian owner. They are disturbing the natural flow of the stream to which he is entitled, by reducing the quantity of water that would naturally flow therein. Their act is an unlawful one. It does not matter whether plaintiff is actually damaged. Nor does it matter that plaintiff does not need the water for use. Their act interferes with plaintiff's right—the full enjoyment of his property without molestation. And, using the language of a Pennsylvania case, relating to such a right, 'the wrong must cease, no matter how trifling it may seem. The right of the plaintiff is absolute to be restored to the full enjoyment of his own property, and is not dependent in any manner upon its value either to himself or to his adversary.' *Wheatley* v. *Chrisman*, 24 Pa. 298. One may not disturb another's field simply because no actual damage is done thereby; the owner of the field is entitled to hold it free from disturbance by another regardless of the amount of damage. The same principle applies to a riparian owner's right to have the undisturbed flow of the stream."

Though a landowner has a right to divert or change the course of a stream flowing through his land, in so doing, he must use due care to provide the stream with a new channel of sufficient capacity to carry off not only the ordinary flow of water, but also such high waters as may reasonably be anticipated from heavy and protracted rains which the former channel was capable of carrying away without damage to neighboring property, provided, of course, that such waters do not amount to an unprecedented flood; and some courts hold that, in instances of heavy rainfall, not amounting to an unprecedented flood, the duty to provide a channel of sufficient capacity is

absolute. 56 Am. Jur., Waters, Section 14; *Garrett* v. *Beers,* 97 Kan. 255, 155 P. 2, L. R. A. 1916F, 1289; *Eikland* v. *Casey* (C.C.A. 9th) 266 F. 821, 12 A. L. R. 179, writ of certiorari denied in 254 U. S. 652, 41 S. Ct. 149, 65 L. ed. 458. See *Hargreaves* v. *Kimberly,* 26 W. Va. 787. The rule adhered to by the English courts and by the courts in many of the states in this country is that a person who diverts or obstructs the natural course of a stream must provide not only for the normal rainfall but for such floods or freshets as may occasionally occur, whether they are called ordinary or extraordinary, though not for unprecedented floods of which the usual course of nature affords no premonition. See note Ann. Cas. 1918A, page 1118. In the English case of *Corporation of Greenock* v. *Caledonian Railway Company,* (1917) A. C. 556, Ann. Cas. 1918A, 1103, decided by the House of Lords on July 23, 1917, the court held that a municipality diverting and obstructing the course of a stream by which it is rendered incapable of carrying away an extraordinary rainfall is liable when a flood results from such rainfall and damages adjacent property, and in an opinion by Finley, Lord Chancellor, this statement appears: "It is the duty of anyone who interferes with the course of a stream to see that the works which he substitutes for the channel provided by nature are adequate to carry off the water brought down even by extraordinary rainfall, and if damage results from the deficiency of the substitute which he has provided for the natural channel he will be liable." In *Soules* v. *Northern Pacific Railway Company,* 34 N. D. 7, 157 N. W. 823, L. R. A. 1917A, 501, the evidence showed that the ditch in question was a natural drain way and served to drain a larger natural drainage basin of about 160 acres. For a long time prior to the flood in controversy the ditch had a well defined channel and grass on the bottom of the channel had been worn away to a width of three or four feet by running water. The evidence did not show that water ran in the ditch continuously or even usually, but did show that it ran in the ditch whenever there were heavy rains and when snow melted in the spring. The Supreme Court of North Da-

kota held that though the defendant railway company had the right to build an embankment across the ditch it owed the duty to the landowners in the drainage area to do so in such manner that the water which could reasonably be anticipated to flow in and be drained by the ditch could be as well accommodated as it was before the construction of the embankment.

As already pointed out, the evidence is conflicting as to the capacity of the ditch or drain between the points F and G to accommodate or drain the water which flowed through the section of the stream between the points E and F and across the lane to the same extent as it was carried before the lane was raised and the ditch or drain from point F to point G was constructed. The plaintiff and a number of the witnesses produced in his behalf testified that the ditch or drain was not adequate for that purpose, and the defendant, Daniel R. Jarrell, and several witnesses produced in behalf of the defendants testified that it was. Notwithstanding the conflict in the testimony of these witnesses on that important point, however, photographs introduced in evidence by the plaintiff taken during the wet or rainy season of the year, in February, 1949, indicate clearly the presence of quantities of standing water in the area near the point F on the land of the plaintiff which were not drained or carried by the ditch or drain between the points F and G, and establish beyond question that the ditch or drain between the points F and G was not adequate for that purpose. The clear preponderance of the evidence, including the photographs and the testimony of the plaintiff and a number of witnesses produced in his behalf who testified that water did not accumulate or stand where it now accumulates and stands on the land of the plaintiff, as shown by the photographs, before the lane was raised to its present elevation and the ditch or drain between the points F and G was constructed, shows that the ditch or drain is inadequate to carry the water which formerly flowed through the section of the stream between the points E and F and across the lane to and upon the land of the defendants. The circuit court

made no express finding on this point, but did find that the ditch or drain from the points F to G, if properly cared for and maintained, is ample to carry the surface water on the east side of the farm lane. As this finding dealt with surface water and not with the flow of the water from the stream, as it was wont to flow before the elevation of the lane and the construction of the ditch or drain, it was based upon a principle of law which does not apply to or control the facts as disclosed by the evidence in this case. For that reason it should be set aside by this Court.

A verdict or a decision which, under the evidence, is contrary to the law governing the case must be set aside. 66 C. J. S., New Trial, paragraph 68. See *Jenkins* v. *Charleston General Hospital and Training School*, 90 W. Va. 230, 110 S. E. 560, 22 A. L. R. 323. Though the rule is well established in this jurisdiction that the findings of the trial chancellor based on conflicting evidence will not be disturbed on appeal unless such findings are clearly wrong or against the preponderance of the evidence, *Holt Motors* v. *Casto*, 136 W. Va. 284, 67 S. E. 2d 432; *Adams* v. *Ferrell*, 135 W. Va. 463, 63 S. E. 2d 840; *Bennett* v. *Neff*, 130 W. Va. 121, 42 S. E. 2d 793; *Sutton* v. *Sutton*, 128 W. Va. 290, 36 S. E. 2d 608; *Taylor* v. *Taylor*, 128 W. Va. 198, 36 S. E. 2d 601; *Hardin* v. *Collins*, 125 W. Va. 81, 23 S. E. 2d 916; *Shipper* v. *Downey*, 119 W. Va. 591, 197 S. E. 355; *Spradling* v. *Spradling*, 118 W. Va. 308, 190 S. E. 537; *Tynes* v. *Shore*, 117 W. Va. 355, 185 S. E. 845; *Kincaid* v. *Evans*, 106 W. Va. 605, 146 S. E. 620; *Ramsey* v. *England*, 85 W. Va. 101, 101 S. E. 73; *Bailey* v. *Calfee*, 49 W. Va. 630, 39 S. E. 642; an equally well established rule in this jurisdiction is that a decree based on conflicting evidence will be reversed when it appears that it is contrary to the preponderance of the evidence, or is clearly wrong. *Adams* v. *Ferrell*, 135 W. Va. 463, 63 S. E. 2d 840; *Buskirk* v. *Bankers Finance Corporation*, 121 W. Va. 361, 3 S. E. 2d 450; *Jones* v. *Hoard*, 108 W. Va. 308, 151 S. E. 183; *Meyers* v. *Washington Heights Land Company*, 107 W. Va. 632, 149 S. E. 819; *Blue* v. *Hazel-Atlas Glass Com-*

*pany,* 106 W. Va. 642, 147 S. E. 22; *Hendrick* v. *Jenkins,* 104 W. Va. 486, 140 S. E. 483; *Wallace* v. *Douglas,* 58 W. Va. 102, 51 S. E. 869; *Pearson* v. *West Virginia Lime and Cement Company,* 56 W. Va. 650, 49 S. E. 418.

The circuit court erred, by applying the doctrine of the balance of equities or conveniences to the facts of this case, as disclosed by the record, in denying the injunctive relief prayed for by the plaintiff. Though in the exercise of the discretion vested in a court of equity to grant or refuse an injunction in any given case the court may consider and weigh the relative convenience or inconvenience and the comparative injuries to the parties which would result from the granting or the refusal of the injunction sought, that principle is subject to recognized limitations. On that point the text in 28 Am. Jur., Injunctions, Section 55, contains these statements: "It has been said that the argument based on the balance of injury to the defendant avails only in a limited class of cases, and that where comparative injury or inconvenience has resulted in the refusal of injunctive relief, it has been where the complainant's injuries were trivial or uncertain or remediable at law. Certainly, the doctrine does not mean that substantial, certain, and irreparable damages to the complaining party, which might be prevented by injunction, are to be left without remedy because of the fact that greater damages would result to the defendant, a wrongdoer, by issuing the injunction. Where the wrong complained of is wilful, wanton, or unprovoked, the injunction should be granted although the loss to the defendant will be greater than the injury to his adversary from its refusal, for no balancing of the inconveniences of private parties will be indulged when the act complained of is tortious in itself as well as in its incidents, and the preservation of a clear right is involved. In such cases, the wrongdoer is not entitled to the benefit of any consideration in a court of equity, nor can it be said that injury would result from the injunction, for no man can complain that he is injured by being prevented from doing, to the

hurt of another, that which he has no right to do." See 43 C. J. S., Injunctions, Paragraph 30, a. The obstruction and the improper diversion of the natural flow of the water of the stream on the land of the plaintiff, caused by the acts of the defendants, constituted an infringement of a property right of the plaintiff and, in determining whether injunctive relief against such infringement should be granted, a court of equity should not resort to or apply the doctrine of the balance of equities or conveniences between the parties involved.

It may be urged, as is indicated in the opinion of the circuit court, that to require the defendants to reopen the stream and reinstate the conditions which existed before the lane was raised and the ditch or drain between the points F and G was constructed would result in hardship or unusual expense to the defendants. The complete answer to any such contention, however, is found in the decision of the Supreme Court of California, in *Allen* v. *Stowell,* 145 Cal. 666, 79 P. 371, 68 L. R. A. 223, in which a mandatory injunction requiring the reinstatement of formerly existing conditions by the removal of dams which caused the water of a stream to be diverted to the land of the plaintiff was granted. In the opinion in that case the court said: "The principles upon which mandatory and prohibitory injunctions are granted do not materially differ. The courts are perhaps more reluctant to interpose the mandatory writ, but in a proper case it is never denied. It was said in *Johnson* v. *Superior Court,* 65 Cal. 567: 'The jurisdiction of the court to grant a preliminary injunction restraining the defendant from interfering with the flow of water pending the litigation, cannot be doubted, and we cannot see that its jurisdiction is exceeded when it requires the removal of the means by which the diversion is made. The ultimate aim of the injunction is the undisturbed flow of the water. The objections to the removal of the means by which the diversion is made are no more cogent than the objections to preventing the diversion of the water itself.'" See *Sweetman* v. *Owens,* 147 Ga. 436, 94 S. E. 542; 56 Am. Jur., Waters, Section 37; 67 C. J., Waters, Section 211 (a), p.

818. A mandatory injunction will be granted when the right of the applicant is clear and the necessity for such injunction is urgent. *Kennedy* v. *Klammer,* 104 W. Va. 198, 139 S. E. 713; *Lamp* v. *Locke,* 89 W. Va. 138, 108 S.E. 889. When a private way is obstructed or closed, a mandatory injunction will lie to clear and open such way for the use of the owner. *Hershman* v. *Stafford,* 58 W. Va. 459, 52 S. E. 533; *Boyd* v. *Woolwine,* 40 W. Va. 282, 21 S.E. 1020.

In view of the conclusion reached as to the character of the stream between the points E and F and beyond, as it existed prior to the elevation of the lane and the construction of the ditch or drain between the points F and G, and the insufficiency of that ditch or drain to accommodate and carry away the flow of the water from the stream to the same extent as before the stream was obstructed and its water diverted, it is unnecessary to consider or decide the question whether the plaintiff has an easement by prescription upon the land of the defendants for the flow of the water of the stream.

As the plaintiff is entitled to a decree enjoining the defendants from obstructing the flow of the water of the stream and requiring them to reopen the stream by installing a culvert in and under the farm lane near the point F of sufficient capacity to dispose of the flow of the stream in its natural course, the decree of the circuit court, which denies the plaintiff this relief, is reversed and set aside, and a decree awarding costs and granting the plaintiff such relief will be entered by this Court.

*Reversed and entered.*

GIVEN, JUDGE, dissenting:

The controlling issue in this cause is not complicated. It relates to the right of defendants, Jarrells, to divert certain waters from a watercourse flowing from land of plaintiff, after such waters enter upon defendants' land. The waters may be surface waters, flood waters or waters flowing through a natural stream or watercourse. The applicable principles of law are fully settled by the

decisions of this and other Courts. The parties hereto are apparently in agreement as to such principles. Factual questions alone are the source of the disagreement.

Plaintiff owns a large farm bordering on the Great Kanawha River. A large part of the farm consists of bottom land, and a large part of the bottom land is situated between the state highway and the river. Defendants own a large farm adjoining that of plaintiff and lying downstream therefrom. The farms have a common property line at all points involved in this controversy. Pond Branch flows somewhat parallel with the property line and directly toward the river until it reaches point "E". Beginning at "E" on Pond Branch and extending across the property of plaintiff to Point "F", near the property line, is a watercourse over which this controversy exists. The elevation at point "E" on the map filed with the majority opinion is 1.8 feet higher than the elevation at point "F". Plaintiff contends that this "E-F" course is a natural watercourse, and that the course formerly continued through a culvert or drain under the farm lane and on through defendants' land. Defendants contend that the ditch is not a natural watercourse and exists only on plaintiff's land for plaintiff's sole benefit.

In 1948 defendants elevated the farm lane road, existing upon their own property, near the property line, and running parallel with that line, and it is admitted that no opening was provided under the lane for the passage of water onto defendants' land from the "E-F" course. At that time defendants also constructed a ditch, entirely upon their own property, between the lane and the property of plaintiff, from point "F" to point "G". The distance from point "F" to point "G" is 288 feet, and the elevation at point "F" is .57 of a foot higher than the elevation at point "G"; and the ditch is at least two feet in width and eight inches in depth, as pointed out in the majority opinion. Defendants contend that this ditch efficiently drains from plaintiff's land all waters which formerly flowed, or could have flowed, onto defendants' land through the "E-F" watercourse. Plaintiff contends

just the opposite. On this point the testimony is, I think, in sharp conflict. The trial court, believing that a finding as to that point was unnecessary to a decision of the matter, made no finding in relation thereto. The majority opinion, however, holds that the clear preponderance of the evidence establishes that the "E-F" course is a natural watercourse. As to that finding, I would be inclined to agree with the majority opinion, for the reasons stated in the dissenting opinion in *Town of Paden City* v. *Felton,* 136 W. Va. 127, 66 S. E. 2d 280. I agree, however, with the trial court, that no finding on that point was called for.

The decree of the trial court is reversed by the majority for the sole reason that the decree was "based upon an inapplicable principle of law." It is my view that the final decree of the trial court was not based upon an inapplicable principle of law, but, if so, the principle of law that should be applied in the disposition of this cause requires that the decree of the trial court be not disturbed because plainly right. "On appeal, error prejudicial to the appellant must affirmatively appear, or the decree will be affirmed." Point 4, syllabus, *Webb* v. *Bailey,* 41 W. Va. 463, 23 S. E. 644; *Pickens* v. *O'Hara,* 120 W. Va. 751, 200 S. E. 746; *Pickens* v. *Wisman,* 106 W. Va. 183, 145 S.E. 177; *Nease* v. *Capehart,* 15 W. Va. 299.

All agree that a down-stream landowner may divert waters flowing upon his lands from the lands of an up-stream owner. The rule is clearly recognized by the majority opinion. Of course, such diversion or interference with the natural flow of water through a natural watercourse must not cause damage to the up-stream owner. In the diversion of a natural watercourse, however, no greater duty can be imposed upon the down-stream owner than existed immediately before the diversion. Therefore, plaintiff is entitled to demand no greater flow of water from his land than the capacity of the "E-F" course prior to its obstruction. The capacity of that course was definitely limited by the capacity of the drain existing under the road for almost fifty years. "* * * Where there

are two channels an owner cannot enlarge one to the detriment of owners on the other." 56 Am. Jur., Waters, Section 14. A down-stream landowner has a right to have the waters pass through his land in their natural flow, not in an enlarged flow or in a different or swifter flow. See *Roberts* v. *Martin,* 72 W. Va. 92, 77 S. E. 535; *Cline* v. *Railway Co.,* 69 W. Va. 436, 71 S. E. 705; *Hargreaves* v. *Kimberly,* 26 W. Va. 787, 57 Am. Rep. 121; 56 Am. Jur., Waters, Section 17.

Applying these principles to the instant proceeding, and assuming that the "E-F" course is a natural one, as the majority holds, the defendants have the absolute right to divert the waters flowing through the same, after the waters enter upon their land, in any direction over their land, and in any manner, so long as the capacity of the course to which the waters are diverted is of equal or greater capacity, and efficiency, as the "E-F" course. There is no question as to the existence of the ditch from "F" to "G". There is no question that waters flow through the ditch. There is no question that defendants constructed the ditch entirely upon their own land. There is no question that the outlet of the ditch is into Pond Branch at "G", on defendants' land. The majority admits that the "evidence is conflicting" as to the capacity of the "F-G" ditch, but gives controlling weight to certain photographs introduced in evidence by plaintiff.

The photographs, in my opinion, should be given little, if any, weight. They were taken in February, a time of the year when common knowledge teaches us that low-lying lands, as these undoubtedly are, are often inundated, or dotted with pools of water from floods, rains or snow during that time of the year. An examination of the photographs will disclose nothing definite or controlling. Actually they appear to establish high land between the "E-F" ditch and the pools of water shown upon the photographs. They also appear to show the natural streams full of water. If at any time there is as much as .57 of a foot of water at "G" in Pond Branch, or more than 1.8 feet of water at point "E" in Pond Branch, the land at

the elevation at point "F" would be covered with back waters from Pond Branch, making drainage of the area impossible in any circumstance, since defendants' adjoining land is at a level, according to plaintiff's evidence, or only at a slightly higher elevation, according to defendants' evidence, making drainage of the area around "F" impossible. If less than seven inches of water in Pond Branch at "G", or less than 1.8 feet of water in Pond Branch at "E", all waters that would have entered the "E-F" course, before the obstruction at "F", would naturally drain back into Pond Branch, without any ditch. The evidence shows that Pond Branch drains a comparatively large area, and that it is very "sluggish" as it creeps through the bottom land. If, as the photographs appear to show, the elevation of some of plaintiff's land in the near vicinity of "F" is lower than the top of the banks of the "E-F" course, waters from rains, snows, floods or seepage would naturally remain thereon, for some time at least. In these circumstances, I can see no possible basis for giving controlling weight to the photographic evidence.

If, however, we give the photographs the weight usually accorded such evidence, facts remain undisputed by plaintiff which establish that the trial court was justified in finding that the ditch from "F" to "G" was of more than sufficient capacity to carry the waters alleged to have been previously carried by the "E-F" course. Until about 1935 the drain under the lane road was a one foot square box, built like a "rabbit box", as pointed out by the majority. About that year a round metal corrugated drain was substituted for the box. One witness for plaintiff testified that the metal drain was "ten or twelve inches in diameter". No witness estimated the size of the metal drain to be larger. Another witness testified that the metal drain was about "eight inches galvanized iron pipe". If twelve inches in diameter, it was of less capacity than the wooden drain. As the majority points out, the ditch from "F" to "G" was not less than eight inches deep and two feet wide, a larger square inch capacity than the wooden drain. No witness testified to

the effect that either the box or metal drain was insufficient to carry all waters under the roadway, other than flood waters. If flood waters were present, drainage would be impossible, for the reason that all surrounding land, including that of defendants, near "F" is low or swampy land. See *Taylor* v. *Railway Co.*, 84 W. Va. 442, 100 S. E. 218, 7 ALR 112. The fall of the entire "F-G" course is .57 of a foot. The fall from "E" to "F" is 1.8 feet. The distance from "E" to "F" is not shown by the record, but the map filed as an exhibit indicates it to be probably twice the distance of 288 feet, so that the difference in the fall of the two courses is of little significance. The additional inch capacity of the "F-G" ditch would more than compensate for any such difference.

Other facts supporting the finding of the trial chancellor are almost as conclusive. Evidence of three witnesses testifying on behalf of defendants relates to measurements taken by them for the purpose of establishing a comparative elevation of plaintiff's and defendants' land near point "F". The taking of these measurements is not disputed. They show the land of defendants, at the lower side of the lane, to be three and one-half inches higher than plaintiff's land just opposite point "F". Thus it would seem that with no obstruction of the "E-F" course by the elevated road, there would necessarily be three and one-half inches of water at "F" which would flow over the low land along the "F-G" course to "G" without any ditch. The width of such low land is not disclosed, but of necessity it is at least two feet wide, the width of the "F-G" ditch, which fully supports defendants' contention that the box drain and the metal drain were maintained under the lane road near point "F" for the sole purpose of protecting the road of defendants. At any rate, any water in excess of the capacity of the box or metal drain would flow along the low land, now followed by the "F-G" ditch, to Pond Branch at "G" on defendants' land.

There is further strong evidence supporting the finding of the trial chancellor. Daniel R. Jarrell was asked:

"Now you would say, or you did say, that the ditch from 'F' to 'G' would carry and does carry the water that runs from 'E' to 'F'?", and he answered, "Yes, sir." He was also asked: "Now I want you to compare the amount of water that is the swamp on the McCausland farm in and around 'F' and in this same section near 'F' now, as to the time prior to the construction of this ditch through there. Is it better drained, better condition now so far as being wet and swamp is concerned?" His answer was, "100% better." He was also asked: "Then now it is adequate drainage in there?" He answered: "Yes, sir." George Love was asked: "I want to ask you further if there was any water in the drain, 'E' to 'F' which drains into 'F' to 'G' if the drain 'F' to 'G' would be adequate to take care of it, drain it out?" He answered: "Well, sir, I would think so." He was further asked: "What would you say as to the drainage, is it better drained now then it was when you first lived on that farm?" He answered: "Yes, it is better drained." Grant Stanley, who had known the property for at least thirty years, testified as follows: "Q. I want to ask you to state if you observed whether or not there was water, or if water would get in the ditch from 'E' to 'F' would it flow out and down through the ditch 'F' to 'G'? A. It would. Q. Now, Mr. Stanley, have you observed over this period of thirty years and what you have seen there this morning, what would you say as to whether or not the McCausland land in the vicinity of 'E' and 'F' is better drained now or worse drained now, as you have observed? A. It is very much better drained. He has a drain now and before he—well there wasn't any."

Other evidence and necessary inferences arising therefrom could be pointed out in support of the trial chancellor's finding, but I deem it unnecessary to do so. The facts pointed out, I believe, not only very substantially support that finding, but are so convincing that no other finding should have been made.

But the majority opinion holds that the only finding of the trial chancellor was that the "E-F" ditch was suf-

ficient to drain surface waters from the land of plaintiff, and that he made no finding to the effect that the "F-G" ditch is sufficient to carry the waters formerly flowing through the "E-F" course. I do not so view the finding of the trial chancellor. True, he says in his opinion that the "F-G" ditch "is ample to carry the surface water on the east side of the farm lane." But in the very next sentence he opines that "It (the "F-G" ditch) has sufficient fall and if kept open will suffice for every reasonable purpose." As before indicated, practically all of the material evidence of both plaintiff and defendants related to the nature of the course from "E" to "F"; whether it was a natural watercourse or whether it carried only surface waters; and whether the "F-G" ditch was sufficient to carry the same waters. Clearly, if the trial chancellor had intended to limit his holding to the capacity of the ditch to carry only surface waters, he would necessarily have had to make a finding as to the character of the "E-F" course, for only after such a finding could he say whether the waters carried by the "E-F" course were surface waters or waters flowing through a natural watercourse. Yet he expressly held that "it is not necessary to decide whether the drain in question is natural or artificial or whether the plaintiff has acquired a prescriptive right to flow water upon defendants' land." To say that the learned trial chancellor of long experience limited his findings to the sufficiency of the "F-G" ditch to carry surface waters only, I would have to believe that he ignored the real issue in the cause, and practically all of the material evidence and the contentions of both plaintiff and defendants. That I can not do. I think it clear that the effect of his holding is that the "F-G" ditch is sufficient to carry all waters formerly flowing through the "E-F" watercourse, whether the waters be surface waters or not, "sufficient for every reasonable purpose."

Some contention is made to the effect that the trial chancellor reached his conclusion as to the facts of the cause by applying an erroneous principle of law. In his opinion he discusses the rule relating to the balancing of

equities or conveniences. Of course, that rule should not be applied so as to destroy clearly established rights or to alter or change the meaning of written agreements. Are any such matters here involved? It is not necessary to decide whether the rule is applicable in the circumstances of this cause. The actual finding quoted above, and also in the majority opinion, was that the "F-G" ditch was sufficient to carry a certain quantity of water. By no process of reasoning can equities or inequities control or affect the quantity of water a ditch will carry. Clearly the trial chancellor did not disregard the evidence of the parties relating to the capacity or sufficiency of the "F-G" ditch to carry all waters formerly flowing through the "E-F" ditch. He reached the conclusion indicated by applying the evidence, and not by applying an inapplicable principle of law. He discussed the evidence fully in his opinion and showed its relation and application to the issue of fact to be determined, and determined the issue of fact in accordance with his views of that evidence. No more could be required. His discussion of an inapplicable principle of law, assuming it to be such, should in no circumstance be made a basis for disturbing his finding, clearly based upon the evidence. There is involved in the instant cause, however, another principle of law to be discussed later, to which the rule relating to balancing of equities, referred to, probably would have application.

In so far as I can find, all the authorities agree that a down-stream landowner may change or divert a natural watercourse upon his own land in any direction and in any manner, so long as he causes no injury to an up-stream owner. The majority opinion recognizes the rule, therefore I need not cite or discuss the authorities. The evidence of all the witnesses, including that of plaintiff, shows that the "F-G" ditch is entirely upon lands of defendants. The majority opinion so shows, although the map would appear to show that the "F-G" ditch is upon lands of plaintiff. Applying the rule just referred to, defendants should be permitted to divert the water flowing upon their lands from the "E-F" course at any point, or in any manner, on their own lands, so long as no injury

is done plaintiff. If a new way or course is provided, of equal or greater capacity than the old course which existed prior to the obstruction, no complaint as to the injury may be heard. The majority reverses the finding of the trial chancellor and makes its own finding to the effect that the "F-G" ditch, as it now exists, is not sufficient for the purposes required. While I believe that action clearly unjustified, it may, for argument, be admitted to be correct in an attempt to make my views clear as to the character of the mandatory relief which should be granted plaintiff.

The majority requires that defendants install "a culvert in and under the farm lane near the point F of sufficient capacity to dispose of the flow of the stream in its natural course, * * *." I believe I am justified in thinking that this means "of sufficient capacity" to carry as much water as the one foot square box which existed from 1901 to 1935, or the metal drain of "10 or 12 inches" diameter which existed from 1935 to the time of the institution of this suit. The plaintiff asks no greater right. When asked what his complaint was, he testified: "I want this outlet over here under the lot like I always had." As before pointed out, no witness testified that the metal drain was more than twelve inches in diameter. From these facts, based on plaintiff's own evidence, we can determine mathematically that the square inch capacity of the ditch is much larger than that of the box or metal drain. No other factor need be considered in deciding the comparative capacity of the drains with that of the "F-G" ditch, except the degree of fall of that ditch with the degree of fall of the "E-F" course. As before pointed out, the fall from "F" to "G" is only slightly less than the fall from "E" to "F". Of a certainty the slight difference could be compensated by widening the "F-G" ditch, or possibly by moving the outlet of that ditch farther down Pond Branch. There is not one word of evidence in the record indicating that it would be impossible for defendants to so provide for the removal from plaintiff's land of all waters assumed to have formerly flowed through the drains. To deny them the right to do so, and to require them to con-

struct or place the drain at its exact previous location, amounts to more than a refusal to apply the rule relating to "balancing of equities". It is the refusal to accord defendants the right to divert the watercourse, after it enters their own land, at any point they may desire so as to do no injury to plaintiff. That this could be done seems beyond question. Why would not an enlargement of the ditch have that effect? Why would not a twelve inch metal or tile drain from "F" to "G" be sufficient, or why could the drain not be placed at some other point under the lane? To require the diversion to be made at the exact location of the prior drain and to be made in a certain manner may, and it probably does, deny defendants the right to reclaim or use certain areas of their own land farther down stream. I think they should not be denied that right.

Being of the views indicated, I respectfully dissent. I would affirm the action of the trial court. If mandatory relief is to be granted, I would restrict such relief so as to recognize the right of defendants to divert the watercourse at any point east or west of the lane, if that can be done without damage to plaintiff. I am authorized to say that Judge Lovins concurs in these views, except that he is of the opinion that the evidence shows that the watercourse from "E" to "F" is not a natural one, but is a series of ponds of surface water.